### BERNARD LYNCH *v.* JOHN CLARKE and JULIA LYNCH.

J. L. was born in the city of New-York in 1819, of alien parents, during their temporary sojourn in that city. She returned with them the same year to their native country, and always resided there afterwards.

*It was held,* that she was a citizen of the United States.

The rule of the common law, by which aliens are precluded from inheriting lands, still prevails in the state of New-York.(*a*)

The right to real estate by descent, is governed by the municipal law of this state, and the legislature may enable aliens to inherit. But while the law remains as it now is, the question on the right to inherit, must turn upon the alienage or citizenship of the person claiming to be the heir.

The right of citizenship, as distinguished from alienage, is a national right or condition. It pertains to the confederated sovereignty, the United States; and not to the individual states.

It is more important and more deeply felt in reference to political rights, than to rights of property.

Under the Constitution of the United States, the power to regulate naturalization is vested in Congress, and since Congress has legislated upon the subject, the states have no power to act in regard to it.

Neither the common law, nor the statute law of the state of New-York, can determine whether Julia Lynch was or was not an alien.

The policy and legislation of the American Colonies, from the earliest times until the revolution, was adapted to foster immigration, and to bestow upon foreigners all the rights of natural born subjects. And this policy continued unchanged in the thirteen original states, while they were united by the Articles of Confederation. The uniform course was, to extend, not to abridge, the right of citizenship.

The common law, by which all persons, born within the king's allegiance, became subjects, whatever were the situation of their parents, became the law of the colonies, and so continued while they were connected with the crown of Great Britain.

It was thus the law of each and all of the states, at the Declaration of Independence, and so remained until the national constitution went into effect, that a child born within their territory and ligeance respectively, though of alien parents who were abiding temporarily; thereby became a citizen of the state of which he was a native.

The Constitution of the United States, as well as those of all the thirteen old states, pre-supposed the existence of the common law, and was founded upon its principles, so far as they were applicable to our situation and form of government. And to a limited extent, the principles of the common law prevail in the United States, as a system of national jurisprudence.

(*a*) Modified by a recent statute. Laws of 1845, Chap. 115.

The subject of alienage, under the national compact, became a national subject, which must be controlled by a principle co-extensive with the United States. And as there is no constitutional or congressional provision declaring citizenship by birth, it must be regulated by some rule of national law ; and from the necessity of the case, that rule must have been coeval with the existence of the Union.

The law on this subject, which prevailed in all the states, became the governing principle or common law of the United States, when the union of the states was consummated, and their separate legislation on the point was terminated.

It is therefore the law of the United States, that children born here, are citizens, without any regard to the political condition or allegiance of their parents.

Children of ambassadors are, in theory, born within the allegiance of the sovereign power represented, and do not fall within the rule.

By the law, as established in Great Britain, as well as in this country, there is, of necessity, in many cases, *a double allegiance.* Thus, where the citizens of the one country, are naturalized in the other ; and where issue are born in the one, of parents who are citizens of the other country.

Such is the law of Spain and Portugal.

By the common law, children born abroad of English parents, were subjects of the crown. The stat. 25 Edward 3, St. 2, *De natis ultra mare,* was declaratory of the old common law.

*Semble,* that children of citizens of the United States, although born in foreign countries, and not within the provisions of the act of Congress of 1802, are nevertheless, citizens of the United States.

The benign policy of this country in reference to immigrants, traced historically, and its wisdom and justice maintained.

The principal point, sustained by reference to the legislation of the states, by state papers, and by the opinions of eminent statesmen and judges, and writers on constitutional law.

The rule of the national or public law considered. It is derived from the civil law, and is not uniformly held in countries, the jurisprudence of which is founded upon that system ; nor is it clearly defined in theory.

The legislation of Congress relative to naturalization, stated historically and at large, by Radcliff arguing for the complainant.

     July 6, 7, 8. 10, 11, and 12, 1843 ; May 6, July 19, and Sept. 17, 1844. Decided November 5, 1844.

THE bill in this cause was filed by Bernard Lynch against John Clarke and Julia Lynch, for the purpose of obtaining a declaration that Clarke was seised of the celebrated Congress Spring and the adjacent lands, at Saratoga Springs, in trust as to an undivided moiety thereof, for Thomas Lynch, formerly of the city of New-York, deceased ; and that the complainant was entitled to all the equitable interests which T. Lynch had in the property. The bill also sought a decree for a conveyance of

Lynch v. Clarke.

the property, and for an account of the rents and profits since the death of T. Lynch.

The case made by the bill, briefly stated, was as follows:

T. Lynch and Clarke were partners in New-York, from 1808 till the death of the former, in 1833. They were very intimate, and reposed entire confidence in each other; and Clarke being unmarried, lived in the family of Lynch. Their firm was Lynch & Clarke, and their business for 20 years or more, was dealing in soda and mineral waters. They first brought the water of the Congress Spring into general notice. After making a trial of the public taste for the water, they resolved to secure the control of the fountain. This object was effected between 1822 and 1830, with some difficulty, and at great cost. Early in 1823, they obtained the transfer, in the name of Clarke, of a lease for a term of years, of the Congress Spring. On the 6th of January, 1823, they procured a deed, (which was also taken in the name of Clarke,) of 97 acres of land, somewhat removed from the spring, but the intervening land was ultimately purchased by them. The consideration of this deed was $700, and it was paid by Lynch & Clarke.

On the 18th of June, 1823, they obtained from the then owners of the Congress Spring lot, a lease in the name of Clarke, for thirteen years, at an annual rent of $30. From this time forward, they enlarged their dealings in the Congress Spring water to an immense extent, and continued the same actively till the death of Lynch.

On the 22d of April, 1826, the owners conveyed the lot on which the spring is situated, to Clarke, for the consideration of $7,500, which was paid by Lynch & Clarke.

On the 16th of June, 1829, they obtained a conveyance of the adjoining tract, the line of which was within a few feet of the spring. This purchase was made because they were apprehensive that some change in the subterranean current of the water might remove the spring to this land. The tract contained about 245 acres; it was conveyed to Clark, and the price was $16,000. Of this sum, $6,000 was paid down, and the residue in two equal annual instalments with annual interest; and the whole was paid by the checks of the firm.

On the 3d of February, 1830, they obtained a conveyance of another tract lying between their first and second purchases. The price was $1,500, and was paid by the firm. The deed was executed to Clarke.

The reason for taking the deeds in Clarke's name was, that he was unmarried and could convey portions, when sold, with facility; whereas the wife of Lynch was intemperate, and often made difficulty when called upon to join in the execution of deeds. The contemporary conveyances of other lands belonging to the firm were taken in Clarke's name.

Soon after the purchase of the Spring, Clarke removed to Saratoga Springs, and has since resided and superintended the operations there. They were conducted in the name of the firm. Lynch remained in New-York, where the principal sales of the water were made, and the business continued there in the same name. The Spring became very profitable, so that before Lynch's death, and from thence to the present time, the net income from it exceeded $20,000 a year.

Thomas Lynch died in June, 1833, intestate, and without issue. He left no heirs in this country, and all his relatives were aliens. The complainant, Bernard Lynch, who was his brother, came to the United States in 1834, and was naturalized in 1839. The legislature of this state, in 1841, passed an act entitling him to the real estate of Thomas Lynch, in the same manner as if Bernard had been a citizen at the death of Thomas; saving, however, the claims of heirs of Thomas, and the existing rights of Julia Lynch.

Julia Lynch was a daughter of Patrick Lynch, who was a brother of Thomas, and died in Ireland before the death of Thomas. Julia came from Ireland to this country with her uncle, Bernard, in 1834. She was then about 15 years of age. In 1839, the legislature of this state passed an act for her benefit, similar in its provisions to the subsequent act for the relief of the complainant, except that the only saving in it was in favor of heirs at law of Thomas Lynch.

The bill alleged that Julia had never been naturalized, and was not entitled to any part of the real estate; and if she were

entitled, it was to one fourth part only. And that Mr. Clarke, since the death of Thomas Lynch, had set up a claim that he was the exclusive owner of the Congress Spring, and of all the lands purchased as before mentioned.

Mr. Clarke, in his answer, stated that the purchases at Saratoga were all made in his own name, and at his risk, and for his sole benefit. That Lynch had from the outset, refused to participate in the adventure, and for many years decried it. That a considerable part of the purchase money was paid out of the funds of the firm, but that the money was loaned to him by the firm, with the concurrence of Lynch, and he had repaid it all to the firm and to Lynch's administrator. He also alleged that Julia Lynch was a citizen of the United States, and inherited all the real estate of Thomas Lynch.

Julia Lynch, in her answer, insisted that she was a native born citizen, and as such inherited all the real estate whereof Thomas Lynch was seised, or to which he was equitably entitled. She moreover claimed that by the act of the legislature in her favor, she was entitled to the whole property to the exclusion of the complainant.

Replications were filed to the answers, and the cause was brought to a hearing on a voluminous mass of documentary and other evidence.

As the case turned upon the citizenship of Julia Lynch, at the time of her uncle's death, it is deemed needless to state any part of the testimony relative to the purchases of the property, and the alleged resulting trust therein in favor of Thomas Lynch.

The testimony bearing upon the citizenship of Julia Lynch, was thus summed up by the court upon deciding the cause.

Her parents were British subjects, domicilled in Ireland. They came to this country in 1815, remained till the summer of 1819, and then returned to Ireland. Julia was born in the city of New-York, in the spring of 1819. Her parents took her with them on their return, and she remained in Ireland till after the death of Thomas Lynch. During the sojourn of her father here, Thomas hired a farm for him and paid the rent. Her

father occupied the farm for a time, but it is proved that he was not contented here. One witness testified that Patrick Lynch, (Julia's father,) always wished to return to Ireland, and that he thought this country did not agree very well with his health. It does not appear that he ever declared his intention to become a citizen under the act of Congress; or ever expressed any intention to reside here permanently. Some years after he returned to Ireland, he came here on a visit, without bringing his wife or any of his family; remained short of six months; and then returned to Ireland, where he and his wife continued to reside until their death.

The cause was brought to a hearing at the July term, (in New-York,) 1843, and was fully argued upon the title of Thomas Lynch to the premises at Saratoga Springs. The argument occupied six days. In September following, the assistant vice chancellor, on taking up the case for decision, became so impressed with the importance of the question upon the citizenship of Julia Lynch, (which although argued in July, was not then made a very prominent point,) that he requested the counsel to argue that question anew. The further argument was made in writing, and the point was finally submitted to the court in September, 1844.

The cause was argued by *H. S. Mackay, Jacob Radcliff* and *Samuel Sherwood,* for the complainant; *G. M. Speir, Charles F. Grim,* and *Murray Hoffman,* for the defendant Clarke; and *A. L. Robertson,* for Julia Lynch. The report of their arguments is limited to the point as to the right of Julia L. to inherit.

*Hay S. Mackay,* for the complainant.

It is contended, that Julia Lynch was at the time of the death of Thomas Lynch, and still is, an *alien* of the United States, and is thereby debarred from inheriting from the ancestor. The case is in effect this, that Julia was born in this country of alien parents, during their temporary stay or sojourn in it, without the intention on their part of making it the country of their adoption. The parents while here, retaining their allegiance to the land of their birth and the *animus revertendi,* and

Lynch v. Clarke.

actually returning to it with the design of resuming it as the place of their continued and permanent abode, and where they died. Julia having been born on the eve of their going back went with them, and was then so young, as (legally considered, at least,) to be insensible of her very existence—an infant in the arms of her parent. She has not been naturalized.

The proposition then is that Julia Lynch, under these circumstances, was and is an *alien* of the United States; and for the better illustration of the subject, it will be reduced to the following points :

1st. That alienage or citizenship, depend on national character, which is a national political right; that is not to be affected by municipal law, or the laws of any particular state of the Union.

2d. That accordingly, the legislative power of effecting naturalization, and also of declaring who are or are not citizens of the United States, belongs exclusively to Congress, the national legislature, by virtue of the Constitution of the United States.

3d. That Congress having legislated on the subject, wherever it has not provided for a case that existed, or may occur, resort must be had to public or national law, which ought alone to govern it.

4th. That it is both impracticable and absurd to decide the question by the authority of English law ; especially as it is on this subject, no part of the common law of this state, being so far, inconsistent with its political constitution.

5th. That this is more especially the case as the question of alienage belongs in the last resort to the head of the federal judiciary, the Supreme Court of the United States, which recognizes no common law, that of England or any other country, as its rule of action.

6th. That no act of Congress that has been passed on the subject of naturalization or citizenship, affects the case of Julia Lynch, and such as furnish any illustration of the legislative sense on the subject, show her to be an alien ; as does the English law on corresponding cases, affecting its own subjects.

7th. Then by recurring to public law, which furnishes the rule of decision, Julia is clearly an alien to the United States,

on the principle that in questions of alienage and citizenship, the child follows the political condition of the parent.

I. There is no such thing, properly speaking, as a citizen of a state of the Union, independent of, or as contradistinguished from a citizen of the United States. It is impossible to conceive any rights or privileges which a citizen of a state might have, or any disability under which he might labor as a citizen, from a state law, that would not, under our system of government, yield to his paramount duties and obligations, rights and privileges, of a citizen of the United States. And wherever the terms " *citizens of a state*" are used in the laws or constitution, they necessarily refer to such who happen to abide in or who have their domicil in the state, (*Cooper's Lessee* v. *Galbraith*, 3 Wash. C. C. R. 546,) the term *citizen* being here used more in the sense of *inhabitant*. It does not mean such who owe exclusively their political rights to the state in which they live. If they are citizens at all, they are American citizens, and not New-York or Virginia citizens. What is contended for is, that there is no such thing as an exclusive parent government in any state of the Union, or an exclusive citizen of a state owing allegiance to the state alone. The citizenship, therefore, of which we speak, in reference to the people of this country, touching the legal question of alienage, is the citizenship, which implies the allegiance of the citizen to the United States, as the parent government and source of political power. It is in this character that he is known abroad, and it is in that capacity he asserts his rights as a citizen, when he has occasion to do so, either in foreign lands or in his own. This is a necessary consequence of the Constitution of the United States, and of the national fabric of government it reared ; presenting as well a national source of power at home, as a national foreign exterior abroad.

The necessary and unavoidable result of this is, that in considering the question of alienage or citizenship, we can form no idea of the political relation of alien or citizen, so far as it may affect the case in hand, but as it regards the position of the individual towards the national government of the United States. *Shanks* v. *Dupont*, (3 Peters' R. 242.)

Lynch *v.* Clarke.

In *Inglis* v. *Sailor's Snug Harbor*, (3 Peters' R. 190,) the national character of John Inglis, an infant, was decided on a principle of public law, that it followed the condition of the father, who was a British subject, the child being under age at the period referred to, and therefore incapable of making an election of his country or allegiance.

If therefore, what is contended for be true in reference to the political relation which a citizen of this country bears and bears *only* towards the United States and its national government, the principles of the above cases cover the whole ground, and exclude the municipal law either of England or of that of any of the states of the Union, from governing the question of alienage or citizenship. This is a dictate of common sense and of just policy. Left to the action or direction of mere municipal law, any rule that might be established on the subject of alienage, would seldom be decided on those general principles of political right or expediency that are necessary to maintain the consequent privileges of the citizen on a respectable or proper basis ; for besides the right of the citizen and of his nation in the question of his alienage or citizenship, foreign countries or their citizens are often interested in its proper establishment.

II. In accordance with the principles above stated, the Constitution of the United States has very appropriately conferred on Congress the power of providing a uniform rule of naturalization, as a matter not of state or municipal, but of national concern.

Before the adoption of the constitution, the several states legislated on the subject, and declared who were or were not to be considered citizens. (2 Kent's Com. 73.) And indeed for a long time afterwards, several states claimed and acted on the solecism, that they retained a concurrent power with the national legislature on the subject. But it is now finally settled by the decision of the Supreme Court of the United States, that the power of passing naturalization laws, belongs exclusively to Congress by virtue of the Constitution. (*Chirac* v. *Chirac*, 2 Wheat. R. 259; *United States* v. *Villato*, 2 Dall. 370.) That a system of national naturalization should be uniform,

belongs to the very system itself. But it could not be so, left to the discordant action of the 26 states of the Union. Besides that, the Constitution declares that the "citizens of each state shall be entitled to all the privileges and immunities of the citizens of the several states," which could not be effected without a system of naturalization emanating from a source superior to and controlling the state legislatures.

This is exemplified by referring to some of the instances of state legislation. By a law of Louisiana, all persons who were residents in the state at the time of the adoption of the constitution of that state, are deemed citizens, (Hil. & Curtis Dig., vol. 1, title Alien.) By a statute of Virginia, (1 Lomax Dig., p. 5,) it is declared that all the rights of citizenship are conferred upon persons other than alien enemies, who shall migrate into the state, and make oath that they intend to reside therein, and also take an oath of fidelity to the commonwealth. But such would not enjoy the rights of citizenship in other states if not otherwise naturalized.

In exercising the power of establishing a uniform rule of naturalization, Congress assumed as a necessary incident, the power of declaring in some few instances who, and under what circumstances, particular classes of persons, should be considered citizens, which however, properly considered, is nothing more than one of the modes of naturalizing such, who without the provision, would have remained aliens. Uniformity, in the sense of the Constitution, does not seem therefore to have meant a general unqualified *uniformity*, running through the whole system, but only a uniformity of degrees or classes. This became necessary in consequence of the diversity of situation in the general population of the country, and their consequent diversified claims to their political rights, so that one general uniform rule of admission to the privileges of citizenship would not have been proper. Some were "native here, and to the manor born;" others born abroad, had emigrated and resided here; some were born here, but of alien parents. And Americans by birth, had children who had been born abroad; some of these were of age, others not; others were daily arriving. Some had been naturalized by the action of the States. It

Lynch *v.* Clarke.

was obvious therefore, that some of these classes of persons were entitled at once to a greater degree of political privilege than others.  He who had been born here, or long resident, had more claims than the one who should have arrived but yesterday, or who might thereafter arrive.  The soldier who fought for, or the civilian who assisted in establishing, the constitution of the country, rather than the coming adventurer.  Each class of the general mass of the population therefore received, in the distribution of this power, its share and measure of it, conferred on Congress.  This will appear from the acts of Congress.

III.  Thus it is clear that Congress, to whom alone it belongs, has acted on and exhausted, so far as it has been judged necessary, the power of establishing a rule of naturalization and of citizenship.  Looking to the times, and the character of the leading men of Congress, immediately after the formation of the Constitution, much instruction and authority is to be collected from what they did, and what they did not do, on the subject.  Their acts stand in the light of commentaries on the Constitution, and the political rights of the citizen.  They had the advantage of the cotemporaneous exposition and understanding of the constitution, and were, many of them, those especially who had the preparation and drafting of the important laws ; politicians in the just sense of the term ; jurists and civilians, instructed in what they undertook to perform.  Some of them practical lawyers, peculiarly versed in the laws of England, and the political rights of English subjects.  When, therefore, we find them in their legislation on the subject of citizenship, omitting to provide for a case that must have existed, or that was likely to occur, we are not hastily to conclude that it was even a *casus omissus* in the legislature, but rather an omission from design, with the view of leaving the case to the operation of the general rules of public law, which as enlightened legislators, they knew governed the case ; and the individual, to the incapacity under which he labored.  If they did not think proper to adopt the policy of England established by her laws in respect to such a case, they are not supposed to have done so through inadvertence or neglect ; but a marked design is rather to be inferred from it, that they in-

tended to leave the alien in that instance just where he was, and to compel him to work his way to citizenship through the probationary or other steps prescribed by the laws. Cases like the present must have existed and presented themselves to their consideration. They were not only obvious and probable, but the case is especially mentioned in Blackstone, the manual of the day, in the correlative case of children born in England of foreign parents. Being silent on such a case, and under such circumstances, without saying that the child should be considered a citizen, manifests the design to leave him just where he was as to his political rights ; arguing that such an one must give evidence at a proper age of his own devotion to the government of the United States ; especially if they had in view that the alien parent might have no intention of becoming an American citizen, and might, with his offspring, return to his country, leaving the child when grown to manhood with every feeling of a subject of the foreign government, to visit this country with the claims and pretensions of a native born citizen ; which is this case. In the case, therefore, of any such designed omission by Congress as this, the general or public law is the only rule of decision properly applicable to the subject, as will be shown.

IV. We could not on such a subject go to a more enlightened source, and to what other should we apply ? Not as has been shown to the municipal laws of the state in which the question might happen to occur. Not surely to England or English law. Is it not a gross absurdity to search in the black lettered pages of English law, in as darkened ages, among the records of "departed tyrants," for cases establishing the present political rights of *American citizenship*, and which Chancellor Kent calls the " *dormant* and *doubtful principles* of *English common law* ?" And when we reflect that all laws or adjudications of ancient nations, as to the political rights of their subjects, must necessarily be selfish, politic and one sided, unfit for a free and just nation to adopt ; the absurdity is enlarged, and it appears no less when we observe the monopoly England has attempted to make, as well of subjects as of most other things, affecting her political interests and national policy. She claims all who are born in her dominions, whether of sub-

jects or alien parents; not on any principle, that should bind the subject to the government, so much as just so many people of whom she has need to man her fleets and armies, and supply her work shops, and foreign possessions; and once a subject, she denies them forever the right of expatriation. If to this we add the want of respect, her policy has at times paid to the rights of our own citizens and laws, when in need of men, and which became the principal cause of the last war between the countries, we may form a still better idea of the absurdity of permitting English municipal law to decide such a question.

The United States has a different policy. Desirous of encouraging emigration, she is yet to do it on proper principles, not only as relates to herself and her own interests, but also in justice to other nations. If, therefore, other countries declare that the children of their subjects born abroad are their subjects, (and that is the case of Julia Lynch,) in which our law concurs, it is not for the United States to declare otherwise. If we make citizens of children born here of alien parents, we could not complain that other countries made subjects of children of our citizens born there. If such children born in this country, wish to shake off the allegiance they owe in consequence of the political condition of their parent, they must do so like other aliens.

The question must be decided on the same principles as if it were in the Supreme Court of the United States. Still, even considered on the basis of the laws of this state, English common law is to be excluded; it being on this subject, for the reasons stated, repugnant to and inconsistent with the constitution; and so by its express exception, no part of the laws of this state.

To show the absurdity of the laws of England on the subject, when applied to this country, and their want of adaptation to its views and policy on the subject; "All children born out of the king's allegiance, whose fathers, or grandfathers by the father's side, were subjects, are considered as natural born subjects to all intents and purposes, unless their ancestors were attainted or banished." (2 Barn. & Cress. 229; 1 Black. Com. by Christian, 373; 2 Kent's Com. 39; Stat. 7 Ann, ch. 5; 4 Geo. II. ch. 21; 12 Geo. III. ch. 21; 25 Edw. III.)

By our acts of Congress of 1795 and 1802 on the subject of naturalization, there are similar provisions declaring that children of citizens born out of the United States are to be considered citizens. So far, the rule is proper and just, and in conformity to that of public law, making the political condition and allegiance of the child, to follow that of the parent. But not content with this, if Calvin's case (7 Co. 10, 1 Bl. Com. 369,) makes the law on the subject, as is contended for, it is also the law of England, that children born in that country of alien parents are held to be natural born subjects ; which comes directly to this, that the rule that England herself establishes as to the birth of a child in foreign parts, of British subjects, out of the king's allegiance, when adopted by any other nation, is destroyed as to such nation, by the rule which renders a child born within the dominions of Great Britain, of foreign parents, a British subject. This very Julia Lynch is herself a subject of Great Britain, on the principle admitted by both countries. If so, how can she be an American citizen, on the authority of British or any other law ?

This is a case therefore in which if we adopt English law ; we must take it as it stands ; and then as birth in her country from citizens of this country, renders the issue a British subject, it repeals our act of congress which declares that children of American citizens born abroad are citizens.

That the children of citizen parents born out of the country should be considered citizens, is reasonable ; as they should enjoy the political condition of their parents, and the government should have the right to the citizenship of the child born of parents to whom it owes the duties of protection. But when the parents are not citizens of the country in which the child is born, and between them and the government the reciprocal duties of protection and allegiance do not exist, what just motive or right is there, to declare such offspring to be citizens ?

This then is one of those questions that requires to be settled on the broad basis of a general rule from sound, consistent national polity, and the sense and reason of the thing. The general presumption arising from the fact that the parents were at the time of the birth aliens to the government is, that their

stay in the country was temporary. If otherwise, the contrary may be made known, by declaring in a court of record their intention. And in the case now in hand, the presumption is sustained by the fact that they did not declare their intention. The parents were absent from the place of their allegiance, by the implied consent of their sovereign, and remained in this country by the courtesy and permission of its government, as foreign subjects. So that this case must be referred to the same principle that would govern when the birth was while the parents were passing through the country, *in itinere;* or on being cast in shipwreck or through mistake of the latitude in navigation, on shore, fortuitously and *nolens volens* detained in the country until they could re-embark; or where it may have occurred on the high seas while making the foreign port; in all which cases, can it be pretended that the birth out of the allegiance of the parents, would render the child a citizen or subject of the country of which they may have thus been the mere temporary and *involuntary* sojourners? And yet where is the difference in principle between these instances and the present case. The stay, if longer continued, was still a mere temporary residence of the parents.

To say that birth, no matter under what circumstances, whether of alien parents or not, is the best and most convenient test of citizenship, is not meeting the question. Universal or public law should decide it, as the rule in truth affects the policy and interests of nations.

We are apt to take our impressions on alienage and citizenship, from readings of English authors. This is improper in considering the political rights of Americans. English laws respecting the mere rights of persons and of things, may be justly the same at London and New-York. In the one case the contract, the policy of insurance, the charter party, &c., the parties and their rights, all stand the same, and sustain their proper relations to one another; in the other *not.*

Chancellor Kent says, that the section of the statute of 1802, relative to children of citizens born abroad, only applies to those in existence before or at the time of passing the act, and not to after born or after becoming citizens; so that the statute will

in time, run itself out for the want of subjects. If permitted to differ from such authority, I think the intention of the legislature cannot be mistaken, and that the act applies to all future cases. Considering the subject matter of the enactment, its importance to the public at large—the absence of all reason for limiting its operation to the existing population, and in truth the greater necessity for applying it to the after born race, proceeding from the greater probability of intercourse which would become unavoidable between the two countries ; it appears to me, that the terms of the act are sufficient to give to the American population then and thereafter existing, considered as a mass or politic body of people of perpetual duration, the benefit of the law ; and that the words which the learned Chancellor seems to think imply only such mere citizens as would supply the present tense of the act, are sufficient, perhaps most proper, to secure to their mere personal successors the advantage of the rule. It is a purely politic act. Not directly or necessarily personal, and is like granting a right or privilege to the members of a corporation or body politic, in which they shall be referred to as the subjects of the enactment, which would enure for the benefit of their successors.

The great and learned Chancellor, was cited on the argument for saying in his Commentaries, that citizens were aliens or natives, and that natives were all persons born within the jurisdiction of the United States. As a general definition, it is true as stated, but it presupposes that the parents are themselves citizens, so as to be in a situation to give to the child the benefit of their own political condition. Where the parents are aliens, if mere birth still constitutes citizenship, the parents must surely give some evidence of the renunciation of their foreign allegiance, or of their intention to become citizens.

V. The English legal rule is more especially to be discarded in this case, which makes subjects from the children of alien parents born in their dominions, as the question is one of national character, and involves the political right of the party and of the government, arising under the constitution and laws of the United States, and belongs therefore, in the last resort to the Supreme Court of the United States, which recognizes in

no case the common law of England as of binding authority. Chancellor Kent does indeed consider it, as to civil cases, " open to consideration," (1 Kent's Com. 338.to 342,) whether the English common law is not the rule of action for that court, and strongly recommends it as a rational system to its adoption. But Mr. Duponceau is clear that there is no common law, *considered as a source of jurisdiction,* controlling the United States courts.

Then this court must decide the question on the same principles on which it would be decided in the last resort, which must be by reference to public law.

VI. In the legislation which Congress has made on the subject of *citizenship* and *naturalization,* nothing has been done or said in express terms, on a case like that of the present. This is very decisive of the question, and amounts to a virtual declaration by Congress, that the person so born is an alien, even unattended with the circumstances that here belong to it, of the parents retaining the *animus revertendi,* and of actually returning to their allegiance in pursuance of it. The writers on public law were well known to those who framed the laws of Congress on this subject, and they had before them the English writers with their finger pointing to this very case. They would then have declared it, if so it had been their intention, that a child so born was to be esteemed a citizen of this the country of its mere birth. But they leave it where the policy and reason of public law had settled it, unaffected by statutory regulation ; the child an alien. Or they may have thought it best to leave the case to the adjudication of the courts, as each particular instance might arise, rather than to attempt to lay down a rule that would at once admit, or exclude him from admission, to the privileges of a citizen.

That Congress had such a case in eye and regarded him as an alien is clear beyond a doubt, from several parts of the statutes on the subject. In the instance of the birth of children of citizens of the United States, which is the correlative case on the same subject, they did legislate, (act of Congress, 1802,) and followed the English rule, because a proper one, and in consonance with the principle of national law. But by the 4th

section of the act of Congress of 1802, it is declared that the children of aliens who are under age, shall when their parents are naturalized, if then dwelling in the United States, be considered citizens. Here we perceive several things. 1. The children are made to follow the condition of the parents, being still under pupilage and their subjection. 2. This is only permitted however, as long as the children manifest their allegiance to the United States, by dwelling in the country. 3. The enactment is general, of children of aliens, without saying those born abroad, or in the United States. It was immaterial and therefore did not require the discrimination. Then as it seems to include the children of aliens born here, a statute was required for the purpose of naturalizing such alien issue, by translating the allegiance of the parent on his becoming a citizen, to the child, he giving assurance of his own fidelity by dwelling here. But so strict did Congress conceive the principle that the political state of the parent actually affected that of the child, and so completely identified the political existence of the one with the other; that in case the alien parent died, even after he should have taken the incipient steps towards his naturalization, and thus gave earnest of his intention to become a citizen; his children had nevertheless been aliens without deriving any benefit from the act; so that it was necessary in the act of Congress of 26th March, 1804, to provide as it does, that when an alien shall have died after declaring his intention to become a citizen before his actual naturalization, his widow and children shall be considered citizens. Here again it is not said what children, and it therefore must include those born here as well as others.

The necessity of these enactments is worth consideration. If it had been intended to allude to children of the alien who had come with him from his country to this, the act would have said so; but it speaks of children generally, which includes all he may have had born abroad or here. There was no reason for a distinction, and therefore none is made. The inseparable condition of the parent and the children controlled; not the birth of the children, but their parentage.

Justice Story, in his *Conflict of Laws*, p. 46, § 40, after citing the English position that persons born in a country are

Lynch v. Clarke.

generally deemed to be citizens or subjects of that country, says, a reasonable qualification of the rule would seem to be that it should not apply to the children of parents who are *in itinere* in the country, or who were abiding there for temporary purposes, as for health, curiosity, or occasional business.

VII. There is no law of the United States that professes to define in what the character of an American citizen consists, nor to exhaust entirely the general subject of naturalization or citizenship. It could not have been done at the time when these laws were passed on the subject, owing to the diversity of situation of the general mass of inhabitants in respect to their political rights, so that no one general rule could then, nor can there now be made, declaring in what precise condition the qualities of an American citizen shall consist. Much of the general question, who are American citizens, was left necessarily to the judiciary to settle and establish, and the books of reports of the United States courts furnish many cases on the subject. But these are of course insular in a greater or less degree : each depends on its own intrinsic peculiarity, from which, except in a few instances, general rules cannot be drawn. For the reasons which have been stated, we must recur for our guide whenever a case occurs, rather to national law, of which it is unnecessary to multiply citations, considering the source from which that now made comes, it is clear that Julia Lynch is an alien. *Vattel, by Chitty*, ch. 19, 101, 2, to p. 105, 6. " By the law of nations, children follow the condition of their fathers, and enter into all their rights ; the place of birth produces no change in this particular, and cannot of itself furnish any reason for taking from a child what nature has given him."

This involves the great principle which evidently was on the mind of Congress when it enacted the naturalization laws. Vattel is in favor of the child retaining his allegiance to the country of which his parent was a subject, and being born abroad therefore cannot take away what nature has given him from the allegiance of the parent. Nor consequently will it enable him to assume a condition inconsistent with this natural and political right, by claiming allegiance to the government of his mere accidental birth, for the acquisition of property, &c.,

which in the present instance is the only motive of the defendant in setting up her citizenship, when nature, reason and national policy deny it.

What legally considered, constitutes that political condition, are the circumstances affecting his residence or domicil. The great political distinction between persons abiding within the state, and owing to it allegiance, and those who make a temporary stay in it, who do not owe allegiance, is pointed out in the ordinance of the Convention of this State, passed 16th July, 1776, which is stated in *Jackson* v. *White*, (20 Johns. R. 313,) and is entitled to great respect. Two things must concur to make a domicil, the *fact* and *intent*. (Story's Com. Confl. of L. p. 41, sect. 44.) With this Pothier agrees, who says there must be *animo et facto*. (And see *Manchester* v. *Boston*, 16 Mass. 230 ; Harper's Eq. Rep. 5 ; *Case* v. *Clarke*, 5 Mason's C. C. R. 70.)

The whole of the question turns upon what from its political character is the gist of it, the allegiance of the child of the alien to the government, which may be irrespective of place or locality.

Now there is every fact in the case before the court to fortify the principles here stated, and call for the application of the cases cited, and from which it appears that Julia Lynch did not and does not owe allegiance to the United States.

That Julia Lynch is a *woman*, makes no difference in the application of the law. A woman is for any purpose requiring it, as much bound to be naturalized as a man. It has been decided in many cases that their alienage affects them in the same manner as it does a man, whether as relates to the recovery of property or what else. (*Kelly* v. *Harrison*, 2 Johns. Cas. 29 ; *M'Daniel* v. *Richard*, 1 M'Cord R. 187; *Mick* v. *Mick*, 10 Wend. 379.)

It is so much of a distinct political right with her, that in *Priest* v. *Cummings*, (16 Wend. 617,) it was decided that the wife might be naturalized without the concurrence of her husband.

This case must be decided on general principles, and however unimportant or harmless, politically considered, Julia

Lynch may be, the decision of the question will affect the condition of all others in like situation. We cannot see how far this and all other questions touching naturalization, may extend at some future time, and become of consequence to both government and party. The child of alien parents, inimical to the political interests of this country, accidentally born in it, after obtaining his education and imbibing his tenets in the country of their allegiance, might come here and claim a seat in our councils; an alien in feeling, to the country and its political interests. Suppose a man in the place of Julia Lynch; could he vote at our elections, or would he be eligible as a native born citizen to the office of President of the United States?

From what has been shown it follows that as Julia Lynch is beyond all question alien to the United States, she is incapable of taking *as heir at law* of her uncle *Thomas Lynch*, the resulting trust in the property in question.

An alien cannot be *cestui qui trust* of such an estate. (*Attorney-General* v. *Sands*, 3 Johns. Ch. R. 20 ; Com. Dig. title Alien, 3 ; Gilbert on Uses, by Sugden, 5, 6 ; 4 Kent's Com. 62.) The people may enforce the equity for the want of other heirs by way of escheat. *Leggett* v. *Dubois*, (5 Paige, 117, 119.) *Hubbard* v. *Godwin*, (3 Leigh's R. 514.)

*Jacob Radcliff*, also for the complainant.

In addition to the foregoing argument the following remarks are submitted.

The Constitution of the United States expressly provides that Congress shall have the power to establish a uniform rule of naturalization throughout the United States. This power from *its nature is exclusive.* It cannot exist in the several states, and be *uniform* throughout the Union. This is well settled by *authority.* (2 Wheat. 259, 269 ; 5th ibid. 49 ; 12th ibid. 276; 3 Story's Com. on the Const., p. 3, and the authorities cited.) The mode of exercising this power, whether by requiring a period of residence, &c., or by declaring who shall be citizens without it, is immaterial, provided it be uniform. Congress having *assumed to exercise* the power, there can be no ques-

tion but that it *wholly* belongs to them. There is no use therefore to discuss what would have been the case if they had omitted to act on the subject.

Independently of this, it may be observed that the power to regulate *foreign intercourse* residing in Congress has a bearing on the question, and as the people of the United States constitute one nation, composed of a number of states, in many respects also sovereign, this power from the reason of the thing, belongs emphatically to Congress, as the representative of the nation, and it is peculiarly their province to determine who shall be entitled to the privileges of American citizens. (*See cases before cited.*) They have not only exercised the power in their legislative capacity, but the President and Senate have by *treaty* exercised it in the case of the cession of Louisiana by France to the United States, by which treaty it was stipulated that the inhabitants of Louisiana should be entitled to all the rights and privileges of American citizens ; and this treaty is the *Supreme Law* of the land. (*Vide 8th vol. Laws of the U. States*, 176; and the 3d article of the treaty, ratified 21st October, 1803.)

The power being exclusively vested in Congress, the local laws of the several states can have nothing to do with it. Therefore, the circumstance of *birth* merely, (if it were otherwise a part of the law of this state, or of the common law of England, adopted by the constitution of this State,) can have no influence on the question.

Even if the laws of Congress did not reach *every* case, it would not follow that the local laws of any state should govern such cases. That would be, to introduce the inconsistent and discordant rules, which the Constitution intended to prevent.

These difficulties were experienced, and created great embarrassment under the old confederation, which also provided as the present Constitution does, that the citizens of each state shall be entitled to all the privileges and immunities of citizens of the several states. (*Article 4th of the Old Confederation.*) These inconsistencies and embarrassments are well described in 3 Story's Com., p. 3, and were the cause of taking this power from the States by the present constitution and granting it exclusively to Congress,

But the laws of the United State *do extend* to every case intended to be reached. They provide a *uniform mode* by which all adult aliens may be naturalized, and they also provide for the children of aliens who are naturalized. Thus the first act on the subject, March 26th, 1790. (*Story's Laws of the United States*, 76,) in regard to such children, declares that those " dwelling in the United States being under the age of 21 years, at the time of such naturalization, shall also be considered citizens of the United States." Here was no distinction between children born in this country or elsewhere.

The second act, of the 29th January, 1795. (*Story's Laws*, 380,) repealed the last act, and required a longer period of residence for adult aliens, &c., but contained the same provisions with regard to their children.

The next act on the subject, June 18th, 1798. (*Story's Laws*, 510,) requires a still longer residence by *adult* aliens, &c., and with regard to their children, has the following broad provision, " that the children of persons duly naturalized under any of the laws of the United States, or who previous to the passing of any law on that subject by the government of the United States, may have become citizens of any one of said states under the laws thereof, being under the age of 21 years at the time of their parents being so naturalized, or admitted to the rights of citizenship, shall, if *dwelling* in the United States, be considered as citizens," &c.

Here again, the dwelling in the United States, and at the time of the parents naturalization, not only form the rule, but Congress, by providing for the case of children of persons who previous to the passing of any law on that subject by the government, may have become citizens of any one of the states, under the laws thereof, &c., plainly indicate their sense, that without such a provision, the children of such persons would not be citizens, and that after the passing by them of the first law on the subject, and they assumed to exercise the power vested in them, the whole power belonged to them *exclusively*, and that the local or municipal laws of the several states could have no influence on the question.

The next is the act of the 14th April, 1802, (*Story's Laws*,

850,) which repeals all the former acts, and with regard to minor children, has the same provisions as those before cited.

The next act, March 26th, 1804, (*Story's Laws*, 942,) extends still further the rights of citizenship, and provides that the widow and children of persons who have taken the *incipient steps*, and who may die before being naturalized, shall be considered citizens, on taking the oaths prescribed by law.

The next act, March 3d, 1813, section 12, (*Story's Laws*, 1304,) relates to persons arriving in the United States, after the close of the then war, &c., and has no application to the present case. The act July 30th, 1813, (*Story's Laws*, 1354,) amends the last act, and relates only to aliens who were enemies during the then war.

The act of March 22d, 1816, (*Story's Laws*, 1539,) relates to a particular class of aliens only, and repeals part of the act of 1802 as to certificates, &c., and does not apply.

Another act of May 26th, 1824, (*ibid.* 1973,) relates to minors arriving in the United States who are aliens, and directs how they may be naturalized after they come to the age of 21 years.

There is no where a provision in favor of children whose parents are not naturalized, or who have not taken the incipient steps to be naturalized. Such children are intentionally omitted, and can only be naturalized after they come to the age of 21 years, according to the act of 1824 last mentioned.

With regard to the children of aliens, no distinction is made between those born in the United States, and those born in a foreign country. The provision in favor of the minor children of aliens is repeated in a number of the acts above mentioned, and the language is uniformly the same, requiring them to be *dwelling in the United States at the time of the naturalization of their parents,* to entitle them to be citizens ; besides the sense of Congress, as further expressed in the act of June 18th, 1798, already noticed.

Surely, if a distinction so obvious was intended, it could not have escaped the attention of Congress, whilst passing the several acts relative to the children of aliens. If intended, how easy would it have been for Congress to have expressed it by saying, the children of such aliens being minors at the time of their arrival or emigration to the United States.

Lynch *v.* Clarke.

All such children, whether born here or in a foreign land, are treated alike, and placed on the same footing. By the present rule, aliens, to be naturalized, must have resided at least five years in the United States, and by some of the acts a longer period was required, during which they probably would have children born here, and yet no distinction is made between them and their other children. There could be no reason for such a distinction, for children whether born here or elsewhere cannot be supposed competent to have any choice in the matter. The qualification requiring the minor to be dwelling in the United States, also strongly indicates the sense of Congress on the subject. A minor of the age of twenty years or even younger, when his parent is naturalized, if residing abroad for the purpose of business, or any other purpose, is not entitled to be considered a citizen, whether he be born in, or out of the country. It is evident, therefore, that his place of birth is not regarded ; for if that would make him a citizen, if born here, this provision would have been inconsistent with it. The act of the 26th March, 1804, by which the widows and children of aliens, who have taken the incipient steps, and die before being naturalized, shall be deemed citizens, also makes no distinction between children born in this country and elsewhere. And the act of the 26th May, 1824, directs, in addition to the former acts, how minors who are aliens, not otherwise provided for, may be naturalized at the age of 21 years.

Thus Congress appear to have exhausted the subject, especially in the case of minors, the children of aliens, and it is believed, have provided for every case that can occur with such restrictions and limitations as they have thought proper to prescribe.

Julia Lynch is not within any of the regulations they have made, and always was, and is, an alien.

But suppose a case to exist not reached by any of the acts of Congress. By what law is it to be governed? Certainly not by the common or municipal law of England, nor by the local laws of this, or any other State.

1st. It being a power, as before observed, affecting the whole Union as a confederacy of independent states, it is obviously fit

and proper, that the general and public law of nations should apply to the case. The power over the whole subject, is therefore vested in Congress, and it is not a power which is divisible, which may be partly exercised by Congress, and partly by the states, or partly governed by the local laws of England, or of any foreign country.

When Congress assumed the power, and used their discretion in legislating on the subject, if they did not provide for every possible case, the necessary inference and result is, that the persons coming within the description of such a case are not naturalized nor intended to be. They are left where they were, *aliens* to the country ; it being the affirmative or actual exercise of the power by Congress in their favor, which alone could make them citizens.

English writers on this subject refer to their own common or municipal law, and to that only, as their guide ; and it seems some of our own, without much reflection, have followed their example. Thus, Chancellor Kent, in his Commentaries, (perhaps, more properly speaking, his *digest of the laws*,) 2 Kent's Com. 39, 50, has adopted the English definition of *subject* or *citizen*, and *alien*. And he proceeds to discuss the English common and statute law, and some of the acts of Congress on the subject, but without touching the present question, or considering it in a national point of view, or as exclusively belonging to the Congress of the United States.

2d. By the English common law, (if that in reality be their law,) the most absurd reason is given in support of it. It is said, that because the child of *an alien* being born under the king's protection, he therefore owes allegiance to the king, and is a natural born subject, that protection and allegiance are mutually obligatory. At the same time, it is admitted, that the alien parent is entitled to protection, and also owes temporary allegiance. Why should the allegiance of the child of an alien extend further than that of the parent ? The one becomes voluntarily, and the other involuntarily, subject to the power of the crown. Is it not inconsistent and absurd to impose on the child an obligation that does not affect the parent ? If it be the English law, that the naked circumstance of birth

constitutes a natural born subject, it is peculiar to the policy of that nation alone, when she at the same time claims the children of Englishmen born abroad also to be her natural born subjects. The English authorities for the origin and support of this doctrine, seem generally to refer to *Calvin's Case,* (7th Co. 18th,) when the facts in that case, and the point there decided, do not justify the conclusion.

Our acts of Congress fully provide for and comprehend the present case; and if not, we must rely (as is well remarked and enforced in the argument of Mr. Mackay,) on the law of nations for our guide on this subject; and for this we also have the high authority of the Supreme Court of the United States, and that of the best writer extant on public or national law. (*Vattel,* p. 101, 2, *ed. by Chitty.*)

*Gilbert M. Speir,* for the defendant Clarke.

(After stating his views of the testimony, and insisting that Patrick Lynch was domiciled here, proceeded on the assumption that he was here dwelling temporarily.)

I. The right to take and hold land in this state is to be determined by the laws of this state, and they furnish the *only rule* for governing the question.

It will not be denied that up to the time of the adoption of the Federal Constitution, titles to land and the laws of allegiance were exclusively subjects of state cognizance. By the constitution the power of the states has been abridged only in determining who cannot inherit. But the state is supreme in determining who can inherit. The power of the states is only restrained by the constitution in those cases where it became necessary to carry out the objects of the general government. (*Ogden* v. *Saunders,* 12 Wheaton R. 281.)

If Julia Lynch took the land in question at the time of the descent cast, she took it under the laws of this state, unless the constitution, or some law of the general government, provided for this case. It is not contended on the other side that there are any such provisions, express or implied. But because there are none, " the public law of nations steps in and disposes of the case," and the following propositions are laid down by

the complainant to prove this. (The counsel then repeated the three first points of Mr. Mackay. See ante, p. 589.)

There is much force in the fact that the courts of the United States hesitated in deciding that the control of Congress was exclusive on the subject of naturalization. See *Collet* v. *Collet*, (2 Dallas, 294.) It shows a desire on their part to allow the states to continue the exercise of their former jurisdiction on this subject. Had there been no provision for naturalizing citizens in the Constitution, would we have appealed to national laws. That is a fair test, and thereby it will be seen that the inference in the counsel's proposition, viz: " The power of *declaring citizenship* belongs exclusively to Congress," is not only a *non-sequitur* to the first proposition, but it begs the question at issue. Neither the authority or the reason, applies in the case of naturalization.

The words " *citizens*," " *natural born citizens*," and " *aliens*" are used, (*Art.* 2., *Sec.* 4 and 5,) by the great founders of the Constitution as substantive *things*, real existences, whose meaning was not only clearly known and understood to those who were familiar with the first principles of the English common law, and of consequence the law of the colonies ; but formed a part of the common learning of the times. And I cannot conceive of a more pernicious doctrine than that " because there is no law of the United States, which professes to define in what the character of an *American citizen* exists," we must have resort to some authority on national law to find it out. If the very axioms of the law as used by the founders of our government in framing its charter were not comprehended by them what can we know of its provisions, objects and ends ? But the law of 1795, passed by Congress, seems to be decisive. If national law governs in this matter, and this were known to Congress, it was unnecessary to pass a statute declaring that the children of American citizens born abroad should be American citizens. Is it true that when the Constitution and the laws are silent on any national question, public or national law must alone determine it? We have no law, constitutional or statute, on the subject of expatriation. What have the courts decided in these cases ? Have they in a sin-

Lynch *v.* Clarke.

gle instance followed the national or public law? The maxim of the common law is "*nemo potest exuere patriam*," (2 *Vin. Abr. Alien, A.* 2; 1 *Chitty Com. Law,* 118;) and this is the doctrine of all our decisions. *Shanks* v. *Dupont,* (3 Peters' R. 242; 1 Kent's Com., and cases cited.) The authority of public law is the reverse of this. (*Vattel,* p. 103, sec. 22d; *Grotius,* 2d *Book,* ch. 5, sec. 24; *Rutherforth's Institutes,* 2d vol., p. 41.)

II. By the laws of the state of New-York, Julia Lynch took and held the lands in question at the time of the descent cast.

*First.* By the common law, children of foreign parents born in England were citizens and owed allegiance to the government. It having been intimated by the court that this proposition seems to be well settled, I shall only cite a few authorities, and pass to the second point under this head which is of more importance here. (2 Kent's Com. 39, 42; Calvin's Case, 7 Coke, 18 a; Chitty on Descents, and cases cited, p. 33.)

But it was contended by the other side, that the error made by the defendants, consisted in asserting the right of Julia Lynch to inherit, upon *citizenship* and not upon her *allegiance.* This position yields all I claim in the case.

Patrick, her father, owed during his residence here a temporary allegiance. And it makes no difference whether he took steps to become a citizen or not. The authority is full on this subject. The principle upon which this rule proceeds is, that since every man born within the jurisdiction of government, from the time of his birth owes to it a natural allegiance in return for the protection which, as the guardian of all infants it affords him, and which debt of allegiance renders him incapable from receiving the advantages of a natural born subject of any other state; it is but just that these advantages should be given to him by the state of which he is actually a native. "It is therefore established that even the children of aliens, if born under the *obedience* of the king are natural born subjects." (1 *Chitty Com. Law,* 109; *Jenkin's R. 5th Cent. Case,* 91; *Wood's Civil Law,* b. 1, ch. 2, p. 115.) This is shown also by the distinction taken by all the writers on temporary and

perpetual allegiance, or national and local. (1 *Blackstone Com.* 275; *Shanks* v. *Dupont*, 3 Peters, 242, by Story, J.)

*Second.* The common law of England has been adopted by this state unless so far as it is inapplicable to her situation or repugnant to her other rights and privileges. "In the charters under which all the colonies were settled, with a single excep- tion, (Pennsylvania,) there is an express declaration that all subjects and their children inhabiting therein, shall be deemed natural born subjects and shall enjoy all the privileges and im- munities thereof," &c. (1 *Story Com. on the Const.* 139; 2 *Wilson's Law Lect.* 48 *and* 49.) Again, says Mr. Story, "the common law is our birthright and inheritance, and our ances- tors brought hither with them upon their emigration all of it which was applicable to their situation. The whole structure of our present jurisprudence stands upon the original foundations of the common law." (1 *Story's Com.* 140.) The common law is in truth the great platform upon which all our law is found- ed and upon which our courts act. By what rules do we in- terpret a contract? and what besides the common law furnishes us with guides in construing the statutes themselves? It is plain that it would be impossible to conduct a judicial proceed- ing without the assistance of the common law. (*Duponceau on Jurisd.*; 1 *Kent's Com.* 311, *Lect.* 16; *Rawle on the Const.* 258, ch. 30.) By constitutional provision the common law is adopted in this state. (Const. of 1821.)

III. By public law, or the law of nations, children born of citizens in a foreign country are citizens, and by this law Julia Lynch would still be entitled to inherit the land in question.

There are but few of the writers on international law who have touched on this subject, and those chiefly of modern times. I shall examine all which has been said on it so far as I can ascertain. The authority relied upon by the other side is Vat- tel. Chancellor Kent says, "Vattel is very deficient in philo- sophical precision. His topics are loosely and often tediously and diffusely discussed." (1 *Kent's Com.* 18.) Mr. Justice Story concurs in this view. Thus admonished, how stands Mr. Vattel on this subject? Read Vattel, Book I. ch. 19; sec. 211 to 217.

These sections contain all that is said on this point. Vattel is peculiar in this ; each of his main definitions or propositions are so framed that there shall be no cases to be excepted from them. To find an authority in Vattel, we must be sure to find the proposition which is intended by the author to meet the case. Hence the error of the complainant's counsel. They cite Sec. 212, which is a definition in the limited and strictest sense of "natives and citizens," the smallest possible circle of that class. He does not define all who compose the citizens of a country, but when we read Sec. 215, we have the identical authority for the question at issue in this discussion ; which is, in the language of the author, "whether children born of citizens in a foreign country, are citizens." "The laws have decided this question in several countries, and their regulations must be followed." "By the *law of nature*, children follow the condition of the father ; the place of birth produces no change in this particalar." "But civil and political laws may, for particular reasons, ordain otherwise." Now this is the authority, and the civil and political laws of England and the United States have decided that such children are citizens, and owe allegiance to the government. "These regulations must be followed," says Mr. Vattel ; for that is the public law in those countries, and that is his reason. The Supreme Court of the U. S. held the doctrine as thus laid down by Vattel in *Dawson's Lessees* v. *Godfrey*, (4 Cranch, 321.) And see *Rutherforth's Institutes*, ch. 2, p. 41.

Mr. Vattel says it is by the *law of nature* that " children follow the condition of their father ;" but he decides this question by *positive law*, such as any particular country may ordain. And see *Wheaton's Elements of International Law*, 100.

Judge Story, in stating what the public law is on this subject, appears to question the exception which is made in cases where even the child is born of foreign parents *in itinere*, or passing through the country. *Story's Confl. of Laws*, 47, § 48. It will be perceived, that the case of Julia Lynch comes within his general rule, and not within the qualifications. Upon authority of public law, therefore, she is a citizen of the U. S.

The doctrine of election, about which so much has been said,

has reference only to cases growing out of the revolution of a government. (*Shanks* v. *Dupont*, 3 Peters' R. 242; *Inglis* v. *Trustees of Sailor's Snug Harbor*, 3 Peters, 190; 20 Johns. R. 332; *Doe* v. *Ackland*, 2 Barn. & Cress. 779; *M'Ilvaine* v. *Cox's Lessee*, 4 Cranch, 211, and cases cited in 2 Kent's Com. 49, 50. And it is applicable in no other case; see *Shanks* v. *Dupont*, per Johnson, J.

*Charles F. Grim*, also for the defendant Clarke.

On the question as to the citizenship of Julia Lynch, insisted that she was born of parents residing here with an intention of permanently remaining, and he argued that her birth here, independent of any permanent residence of her parents, made her a citizen of the United States—a *native born citizen* within the meaning of the Constitution of the United States, of this state, of the common law of England, and of all the states that were in existence when the Constitution of the United States was adopted; and that she was a citizen, and not an alien, within the meaning of those words as used in the law of inheritance in this state.

The natural meaning of the word native, its every day use, denotes its meaning in law. The proud and imposing exclamation "This is my own, my native land," is felt and understood as readily and as universally as the language itself; it comprises as well the privileges as the duties involved by the birth. Whilst this is the meaning of language, we can go further, and gather, from the legislation of different countries passing enactments to legalize at home the offspring of their subjects born abroad, that the general sense of mankind and of governments as to the incidents of birth-place is the same, and that citizenship is inherent from the place of nativity. If Julia Lynch is to be called an alien, then she were a native born alien. If called a citizen of some other country, then she were a citizen of a country to which she is not native. These seem blunders in language and reason, and no principle could betray us into them. If her birth here imparted no citizenship; if, whilst born here, she is an alien because of her parents, then, as was well observed by her own counsel, the next generation

would be alien for the same reason.   Where is it to stop, or
when is birth to impart citizenship ?  the disability must descend
*ad infinitum.*

An alien is *alienigena* (*alieno loco genitus*) or, according to
Blackstone, (1 *Com.* 372,) and note quoting Spelman's Glo. 24,
is *albinatus,* (*alibi natus,*) or, as is said in Calvin's case, 7 *Co.*
*R.* p. 31, 32, (quoting Co. Lit. 128 *a,* 129 *b,* § 198,) alienæ
gentis seu *alienæ ligeantiæ qui extra terram,* i. e. *potestatem
regis natus est.*   A native is *nativus* or *natus ;* one born in
the place.

What is the language of courts as to citizenship ?  " This
ligeance and obedience is an incident inseparable to every sub-
ject, for as soon as he is born he oweth by *birth-right* ligeance
and obedience."   *Calvin's Case,* 7 *Co. Rep.* 8.  " By all
which it evidently appeareth that they that are *born* under the
obedience, power, faith, ligealty or ligeance of the king, are
*natural subjects* and no aliens."—*Id.* 10.   " There are found
in the law four kinds of ligeances, the first is *ligeantia naturalis
absoluta pura and indefinita ;* and this originally is due by
nature and birth-right, and is called *alta ligeantia,* and he that
oweth this is called *subditus natus.*"—(*Id.* p. 11.)   Julia
Lynch then owed this first allegiance to the United States at
her birth, and was a *subdita nata,* or in our free system, a na-
tive born citizen of the United States.

And as to alienage ; " An alien is a subject that is born out
of the ligeance of the king, and under the ligeance of another."
(*Id.* p. 32.)   " The usual and right pleading of an alien born,
doth lively and truly describe and express what he is.   And
therein two things are to be observed,—1. That the most usual
and best pleading in this case is, both exclusive and inclusive,
viz. *extra ligeantiam domini regis,* &c., and *infra ligean-
tiam alterius regis,*" &c.  (*Ibid.*)   Could the complainant
venture such a plea to an action by Julia Lynch ?  Could he
plead that she was born without the allegiance of the United
States, and within the allegiance of the King of England, &c. ?
Such are the averments required to make her an alien.

The report (of Calvin's Case,) p. 47, refers with much force
to the case of St. Paul.   His parents were Jews, as they were

then called, of the tribe of Benjamin;—they were therefore aliens to Rome. But he was born in Tarsus, a city of Silicia, subject to the Roman Emperor. Therefore he said, as the report quotes it, " *Ego autem et natus sum,*" that is, *Civis Romanus.*

The decision in Calvin's case was not confined to the mere municipal law of England. It was a question regarding the two kingdoms of England and Scotland, then not united, though under one king, and having to this day fundamentally different municipal laws. It was then considered, " that the ligeance of faith of the subject is due unto the king, by the law of *nature ;* secondly, that the law of nature is part of the law of England ; thirdly, that the law of nature was before any *judicial* or *municipal* law ; fourthly, that the law of nature is *immutable.*" (*Id.* p. 24.) As early, then, as Calvin's case, it was clear law, both national and municipal, of England, law brought by the colonists to this country, that the child born here of alien parents was a native citizen of this place, and not a citizen of the birth place of his parents.

Again. Natural allegiance is such as is due from *all* men born within the king's dominions, immediately upon their *birth,* (1 Bl. Com. 369;) and on p. 373, he declares this to be the general principle. The law, as stated in Calvin's case, is also found in Co. Lit. 128 b, 129 a, § 198, and is shown by the statutes 25 Edw. III. ch. 2, (anno 1350,) and 11 & 12 Will. III. ch. 6, and 29 Charles II. ch. 6 ; all which recognized that a man is " a natural born subject," although his parents are aliens, and that those who are born out of the king's allegiance, were not natural born subjects. And see the explanatory act of 4 *Geo.* II. ch. 21. *Barrington on Stat.,* p. 268, 269, and 2 *Kent's Com.* p. 43, also *id.* 55.

Nor are authorities wanting in our own courts to the same effect as to citizenship, even in the tribunal to which the complainant's counsel so often challenges us—the Supreme Court of the United States. In *Lessee of Levy* v. *M'Cartee,* (6 Peters, 102. 109. Justice Story at p. 114, quotes the case of Collingwood v. Pace, and decides the case before him by it. So in 3 *Peters,* 99, *Inglis* v. *The Sailor's Snug Harbor,*

Lynch v. Clarke.

where the very question was whether John Inglis, the demand-
ant, was an alien to the United States, Justice Thompson says
at p. 120, "It is *universally* admitted both in [the English
courts and those of our own country, that all persons born
within the colonies of North America, whilst subject to the
crown of Great Britain were *natural born subjects;*" and the
court held (p. 189, 190,) that if the demandant "was born
after the 4th July, 1776, and before 15th September of the same
year, when the British took possession of New-York, he would
not be under the disability of alienism and of incapacity to in-
herit real estate." "If he was born after the British took pos-
session of New-York, and before the evacuation on the 25th
November, 1783, he would be under the disability." This case
forms an express decision, 1st, that the son of an alien born
within the allegiance of the state of New-York is not an alien,
but is capable of inheriting real estate, although his father
joined the enemy, took the son with him, and brought him up
in a foreign land to manhood, for such were the facts of that case.
The case further establishes that had the child been born in a
place occupied in fact by British troops in opposition to the
United States, he was a British subject. The place of birth of
the child, therefore, was the controlling matter; and whilst Jus-
tice Story differed with the majority of the court on some points
he agreed in these, and adopts the rules which we have urged.
(p. 155.) The exceptions stated, (and regarded as confirming the
doctrine,) are persons born at sea, for they are thus born under
the protection of the sovereign of their parents; the children
of ambassadors for the same reason; and the children of ene-
mies born within a place conquered by them who retain the al-
legiance of their parents, while the children of the natives of
such place regain the allegiance of their fathers on the coun-
try being restored to the former sovereign. At page 164, Judge
Story says, "That the father and mother of the demandant
were British born subjects is admitted. If he was born be-
fore the 4th of July, 1776, it is clear that he was born a
British subject. If he was born after the 4th July, 1776,
and before the 15th of September, 1776, he was born an
American citizen, *whether his parents were, at the time of his*

*birth, British subjects or American citizens.* Nothing is better settled, as the common law, than the doctrine that the children even of aliens born in a country, while the parents are resident there under the protection of the government, and owing a temporary allegiance thereto, are subjects by birth. If he was born after the 15th of September, 1776, and his parents did not elect to become members of the state of New-York, but adhered to their native allegiance at the time of his birth, then he was born a British subject." All these authorities show, (and especially that of Inglis,) that there need be no residence of the father here, no *animus manendi*. The cases on the question of intent, relate in fact to a very different subject. The case of *Auchmuty* v. *Mulcastor*, (5 Barn. & Cress. 771, and 5 Dowl. & Ryl. 593,) contain nothing contrary to these views. In *M'Creery* v. *Somerville*, (9 Wheat. 354,) Isabella M'Creery, the lessor of the plaintiff, was one of the daughters designated *native born citizens* of the United States ; yet their father was a native of Ireland, and had never been naturalized ; the court throughout treat her as a native born citizen. See also the remarks of Sewall, J., in *Gardner* v. *Ward*, (2 Mass. R. 246 and 250,) and in *Kilham* v. *Ward*, (*Id.* 264—5,) Carr, J. 2 *Leigh's Rep.* 109. Also, 1 *Chitty Com. Law*, 114, 115, 116.

*Bacon* v. *Bacon*, (Cro. Car. 601—2,) was quoted as showing the common law to be different ; but it in fact is with us, for it decides only that the children of an Englishman born abroad where he resided for trade, were capable of inheriting. It was said, " by the common law, *or rather*, as Berkely said, by the statute 25 Edw. III." The " rather" affords the true reason. See also, 4 Term R. 300, 308 ; *Doe ex dem. Count Duroure* v. *Jones*, per Lord Kenyon, Ch. J. ; and Chancellor Desaussure in *Harper's Eq. Rep.* 5, 11.

In *Jackson* v. *Fitzsimmons*, (10 Wend. 9,) Chancellor Walworth recognizes the common law rule, " that if an alien had children born within the king's allegiance, they might inherit from each other." In *People* v. *Conklin*, (2 Hill, p. 70, 71,) Bronson, J., says ; " But if Edward Englehart had been a *native citizen* of the United States, I do not see how he could make title to his father's share of the property. His father Joel,

who was himself an alien, had no inheritable blood." He therefore was of opinion, that the father might be *an alien*, and his son a native citizen.

Thus through the whole history of the law down to this time, has this opinion been sustained without a doubt being cast on it, until the complainant in this suit raised the question.

When the word citizen was used in the Constitution of the United States, it had this established meaning and was so used there; this was not merely its natural and popular meaning, but its legal and technical meaning. The common law was the law of all the states at the adoption of the Constitution of the United States, and it is natural to infer that the terms used there, were used in the sense of the common law. The courts therefore refer to the common law to define those terms. See 1 *Kent*, 338, 342, &c., and this whether the common law be part of the law of the general government or not, which is a very different question. Thus " *ex post facto* laws," mentioned in the Constitution, did not mean as the civil lawyer, or writers on the laws of nations would suppose, any retrospective laws, but only retrospective *criminal* laws; and that because it was so understood at the common law. So when the Constitution of the United States, Art. 2, § 5, declares that "*no* person except a *natural born citizen,* or a citizen of the United States at the time of the adoption of the Costitution, shall be eligible to the office of President." And the Constitution of this state, Art. 3, § 2, that " no person except a native citizen of the United States shall be eligible to the office of Governor," they mean the individuals known as native or natural born citizens to the law as it existed here before the adoption of the Constitution. Neither Constitution defined what a native born citizen was, for the received acceptation of the phrase and the law of the land had already done that too plainly to leave a doubt. So also per Parsons, Ch. J. in *Ainslie* v. *Martin,* (9 Mass. 454;) applying the same rule to the Massachusetts statute.

It is plain that our judges have all acted on this principle in the state and in the United States courts; looking always to the

common law to define who were citizens. See especially the case of *Inglis* v. *Sailor's Snug Harbor*, throughout, and Story's remarks at p. 155-6, all borrowed from the common law, and treated by him as recognized equally in the law of nations.

This state has adopted the common law meaning of citizen, by adopting the common law as part of the laws of the state ; and in the particular matter of the inheritance to lands, it has done so more particularly by enacting that " in all cases not provided for by the preceding rules, the inheritance shall descend according to the course of the *common law*." (1 *R. S.* 753, § 16.) The state can allow aliens to inherit. If Julia Lynch by the common law is a citizen, and were by the law of the United States an alien, still she would inherit under this section as one entitled by *the common law to inherit*. A similar argument from this clause of the statute is used by Justice Story in *Lessee of Levy* v. *M'Cartee*, (6 Peters, 110,) to show that the common law, as distinguished from the statute 11 Wm. III. ch. 6, was to govern the law of inheritance in this state. This distinction as to the meaning of citizenship, according to the subject to which it is applied, is also sustained in 16 *Mass.* 230, 234, *Manchester* v. *Boston*, by Parker, Ch. J. The complainant's counsel, however, seemed to argue that the Constitution of the United States, or the naturalization law, had created a different rule of citizenship : He argued that citizenship is a national question, and therefore not to be determined by the common law.

But is it true that this is a national question in the United States ? Congress possesses no power except that which is expressly granted, or is necessary in the execution of the powers granted. To prove a matter national, does not give to the United States power over it. It would be a national matter to make uniform laws on the subject of slavery throughout all the United States ; to make uniform laws as to inheritances of estates, or any other matter made to affect all the Union. Under such a definition, Congress might absorb all power. We must come back to the constitution, and place the finger on some clause, and show that it confers the power. The only clause

in the Constitution on the subject, is Art. 1, Sect. 8, Pt. 4, which gives to Congress power " to establish an uniform rule of naturalization." The term " naturalization" shows the extent and the limits of the power ; it means " the act of investing aliens with the privileges of native subjects" or citizens. ( *Walker's Dictionary, from Johnson.*) It is a power to *make* citizens, not to *unmake* them, not to take away the character of citizens where the law, as it stood before the Constitution, would have conferred it. The Constitution gives rights to " native born citizens ;" it assumes, therefore, that those are words already understsood *in our law,* and when it omits to define them, and to give to Congress the power to define them, they must continue to mean what they meant in our law before the Constitution was adopted. The granting of the limited power, viz : to " *naturalize,*" and stopping there, by implication excludes the power to limit the character of citizenship. If Congress had by its legislation altered the common law rule, the act would be without authority and void. But most clearly Congress has not done so.

The argument of the complainant's counsel contains two fallacies, the failure of either of which destroys his whole superstructure : One, that the clause in the act of congress which naturalizes the children born abroad of citizens of the United States is prospective,—and the other, that the children born here of aliens, must therefore, be aliens to us. As to the first fallacy, the words of the law, (*Story's Laws U. S.* p. 851, &c.) are too plain to admit of doubt, they are " the children of persons who *now are* or *have been* citizens of the United States shall, though born out of the limits and jurisdiction of the United States be considered as citizens of the United States." Chancellor Kent says, " The clause is *certainly* not prospective in its operation." (2 *Kent's Com.* 45.) Again : The very enacting of this clause, and especially in this limited way, shows that without this legislation, the children of citizens born abroad would be aliens ; and it shows what Congress understood to be aliens, by contrasting them with citizens by the word, though ; " *though born out of the limits and jurisdiction of the United States.*" Nor is the other branch of the

argument less fallacious, viz : That if Congress makes the children of citizens, born abroad to be citizens, it as a consequence makes or declares the children born here of aliens to be aliens. From the views of the Constitution which we have presented, Congress has power to do the first, but never to do the last.

Again. The whole language and requirements of the naturalization laws, have reference to persons born abroad and arriving here, and have no reference to any one *born here.*

Julia Lynch born here is not within its provision, and if an alien, she must remain so, and her posterity after her forever, without any benefit of the naturalization laws. The clause naturalizing infant children, receives its appropriate interpretation by confining it to the infant children who require its aid, namely, those who are born abroad.

Story in his Commentaries on the Conflict of Laws, is speaking rather of *domicil,* than of *citizenship,* when he applies the principle, *Patris originem unus quis que sequatur,* and that if the parents are on a visit or *on a journey,* the home of the parents (*at least if it is in the same country,*) will be deemed the domicil of both or nativity. (His views of the law as to citizenship, are to be found in *the decisions* to which we have referred.) Thus the rule is limited to states, and perhaps cities or towns, within the same country. And after he has stated that persons who are born in a country are generally deemed to be citizens of that country, he does not state that there *is* any qualification to the rule, though he suggests one as being reasonable.

Vattel was quoted as an authority against the rule for which we contend. Yet if his own explanation of his own terms is used, it may be an authority in our favor ; he prefaces this chapter by stating that he had previously defined the term *native* country, and refers to § 122, where he says, " when we speak in general of the duty to our country, the term is to be understood as meaning the state of which a man is an actual member." Patrick Lynch was an actual member of this state at the time of his daughter's birth.

Our state convention on 16th July, 1776, (see 20 Johns. R.

315, 325, which was referred to by the complainent's counsel, with approbation,) shows its views of national law ; it declares "that all persons *abiding* within the state, and deriving protection from its laws, owe *allegiance* to its laws, and are members of the state," and then distinguishes those passing through merely, or visiting, or making a temporary stay. According to that first rule, Patrick Lynch, who was abiding here, was a member of this state. When Vattel says, "the natives or natural born citizens are those born in the country of parents who are citizens"—he must by his own reference, mean of parents who are residents there ; who have the *right* of perpetual residence. But whatever may be his meaning, it is plain that he is not speaking of a universal law, but probably of the law of France and of some other states. (*See Sect.* 214.)

The case of Inglis against the Sailors Snug Harbor, referred to by the counsel for the complainant, if it showed the right of the father to elect allegiance, (which was only in case of a civil revolution,) and to elect not for himself alone, but for his children under age, it showed also *a right in the child when at maturity to affirm or disaffirm that choice.* Now, Julia Lynch, born early in 1819, has been of age upwards of 4 years. She came here before she was of full age and upon the death of her parents. She has resided here since 1835, claiming to hold the real estate of which her uncle died seised, which she could do only as a citizen of the United States. Her acts have shown a clear election by her to be considered a citizen of the land of her nativity. The same right of election at maturity, is allowed by the French code. (*Civil Code,* lib. 1, tit. 1, § 9 ;) and by Vattel, (see § 212 and § 220.)

The remarks of Story, J. in *Shanks* v. *Dupont,* (3 Peters' R. 248,) are quoted as sustaining the view that citizenship depends on the law of nations. This is a misapprehension; he was speaking not of the original character of citizenship, but of an entirely different matter—that is to say, of the law applying to their *acquiring* or *losing* a national character in the case of a *revolution*, and this in reply to the argument that a feme covert being under disability, could not by the municipal law change her allegiance. The case in 16 Mass. 230, was quoted

to prove that a son follows the condition of his father; that is also a case of one at the revoluion making his election as to the state to which he would attach himself.

*Murray Hoffman*, also for the defendant Clarke.

The question now to be discussed, is whether Julia Lynch had not inheritable blood, so that without the aid of any enabling statute, she took as heir of Thomas Lynch, deceased.

It is submitted in the first place, that a fundamental error is the foundation of the elaborate argument of the complainant's counsel. He treats the power of Congress under the Constitution as comprehending the declaration of who are citizens, as well as the establishment of a system by which those who are not citizens may become such. The power conferred is " to establish an uniform rule of naturalization." The authority presupposes the case of foreign subjects or citizens. In their case it operates. Their condition is changed, through laws of the United States, enacted under this authority. But every question as to who are already citizens of the United States, or a separate state, for political or civil purposes, is untouched by the power given to Congress. If the principle contended for was right, then the dissolution of citizenship must be as exclusively in the federal government as its creation. But in the well argued case of *Alsbury* v. *Hawkins*, (9 Dana, 178,) the court in Kentucky held that one who had removed to Texas, with the plain intention of becoming a citizen, had expatriated himself, at least as to civil rights; that the assent of the state and of the United States must be presumed, and he was to be deemed an alien, more decisively where civil rights were concerned. The court admit the right of the general government to determine upon the question of a dissolution of allegiance for political purposes, but hold that even this may be presumed, from its silence. But whatever be the rule on this great question, the operation as to civil rights is fully maintained. (See 2 Cranch, 64.)

The very first section of the act of Congress of 1802 is clear upon the subject. " *Any alien*, being a free white person, may

be admitted to become a citizen, on the following conditions." Thus the power operates upon acknowledged aliens, and extends under Section 4, to children born abroad, of parents who become naturalized. (See *West v. West*, 8 Paige, 433.) The act finds these children to be still aliens, and under certain conditions, holds them to be citizens.

Another law then must govern, if the laws of Congress relate entirely to distinct matters ; and that law is the rule of decision as to civil rights in the several states ; and in our state that rule is the common law of England, except as modified by statutes. (Constitution, State of New-York ; 2 Kent's Com. 48. 51, 4th ed, ; *Cox v. Gillian*, 5 Halsted, 328.)

Now the common law makes every one born within the king's ligeance a subject, no matter whether his parents were foreigners or subjects. (*Chitty on Descents, and cases*, p. 33 ; 2 *Kent's Com.* 39, 42 ; *Litt. Ten.* § 198 ; *Co. Litt.* 128 *b*, 129 *a ; Calvin's Case, 7 Coke*, 18.)

All persons born out of the ligeance were aliens, all within it were subjects. And this rule was so inflexible that even the children of subjects in consular employ, and born abroad, were aliens. Successive statutes provided for this case. These will be found in Chitty on Descents, p. 33.

Another rule, however, of the common law affected the position. That was that a subject could not take, if the title was to pass through an alien. Hence if a father was an alien and a grandson a subject, the latter could not take from the grandfather ; nor could a nephew take from an uncle, if the brother, (the nephew's father,) was an alien. *Collingwood v. Pace*, (1 Vent. 414 ;) *Jackson v. Green*, (7 Wend. 334 ;) *Levy v. M'Carty*, (6 Peters, 102 ;) *Jackson v. Sanders*, (2 Leigh, 100, 109.) To remedy this the act of 11 Wm. III., ch. 6, was passed.

Thomas Lynch died in 1833, and in 1830, a similar statute was passed in this state. No person capable of inheriting shall be precluded from such inheritance by reason of the alienism of any ancestor of such person. (1 Rev. Stat. 754, § 22.) Whether Patrick died before or after Thomas, becomes then immaterial. The descent was cast in 1833. Julia being born here, was capable of inheriting, but before 1830 the necessity of making

title through her father, an alien, would have defeated her. That difficulty is removed by the statute of 1830, and her title became absolute and clear.

*Anthony L. Robertson,* for the defendant, Julia Lynch.

The question presented for re-argument is simply the right of Julia Lynch to take and hold land in this state, which is denied by the complainant; it being averred that she is not a citizen of the United States.

Citizenship has privileges and obligations in reference to one's own fellow-citizens or government, or in reference to foreign governments or citizens. The former may be designated as *municipal* or *internal ;* the latter *national* or *external.* Of the first kind, are the rights of holding lands, voting for public officers, carrying on commerce, and the like ; of the second the duty of one's government to protect us against the aggression of foreigners, or respond to them for our aggression. With regard to the internal or municipal rights, foreign nations have nothing to do : it is left to the internal institutions to regulate the gift of such rights, and national character has nothing to do with them. Consequently, under our system of internal government, states may grant municipal rights of citizenship to aliens, unless in conflict with the powers of the general government. The ultimate ownership of the soil is in the state, where situate not in the federal union; for the Constitution was obliged to give to that in express terms the right of sovereignty over lands necessary for national purposes. (Art. 1, Sec. 8, § 16.) The right of *eminent domain* is vested in the states; they acquire a title lost by escheat, and it is for them to prescribe the rules in which that power shall have effect. And down to the present time, *aliens,* that is those *admittedly* not citizens of the United States under the Constitution, have held lands by virtue of the laws of those states, and I presume might take them by inheritance, should it be the policy of any state to allow them. There is therefore nothing inconsistent in leaving to those who would have been citizens of the state of New-York before the adoption of the federal constitution the right of holding lands in this state, and yet depriving them of all the advantages attendant

upon a national citizenship, as citizens of the United States under the constitution. (*Wheaton* v. *Peters*, 8 Pet. R. at page 688.) It cannot be held that such adoption abolished all state laws authorizing persons who would be aliens under the constitution to hold lands, and they must be expressly re-enacted to be valid.

The only question therefore is, would one born under similar circumstances with Julia Lynch, have been a citizen of the state of New-York before the adoption of the federal constitution; if so, she could have held lands here; for the law could as well have provided that persons so born should hold lands as have declared said persons so born should be citizens of the state, and such citizens should hold lands. I therefore proceed to show that one so born would have been such citizen. (See Judge Thompson's remarks in *Wheaton* v. *Peters*, 8 Pet. R. 591, as to copy-right.)

Judge Story, giving the decision of the court in the case of *The Town of Pawlet* v. *Clarke and others*, (9 Cranch R. 333,) says, "we take it to a clear principle that the common law in force at the emigration of our ancestors, is deemed the birth-right of the colonies, unless so far as it is inapplicable to their situation, or repugnant to their other rights and privileges; a fortiori, the principle applies to a royal province." See *Baines* v. *Schooner Catharine*, (1 Baldw. C. C. R. 563.) The New-York Constitution of 1777, Art. XXXV. and of 1823, Art. VII. sec. 13 ; recognizes and perpetuates its existence here until altered. By the common law the children of foreign parents, born in England, were citizens; (*Chitty on Descents and cases cited*, p. 33 ; 2 *Kent's Com.* 39. 42; *Calvin's Case*, 7 Co. 18 a,) called by Vattel, "Naturalization from the time of birth." (B. I. Ch. XIX, § 214.) It could not be a law inapplicable to the condition of the colony, and therefore left behind in their immigration; for it is made one of the complaints in the Declaration of Independence, against the British Executive, that he had obstructed the laws for the naturalization of foreigners.

It thus appears that children of foreign parents born in this state, could hold lands by a law in existence before the adoption of the Federal Constitution ; that law was not changed by the

articles of confederation; for that expressly provides, (*Art.* 4,) that the inhabitants of each state should have the same immunities as citizens of other states, and the people of each state should have the same privileges in other states as the inhabitants thereof; the terms, people, inhabitants, and citizens of each state being fixed by the law of that state. So that had Miss Lynch been born under the same circumstances before the Federal Constitution was adopted, she would have been entitled to hold lands, not only in the state of New-York, but every where in the Union. Notwithstanding, such birth in another state, might not have made her a citizen of that state. Still it is contended that the Federal Constitution abolished all laws allowing the children born here of foreigners to hold lands; a matter which there is not a jot of, in that instrument to affect; for not only does it not prohibit aliens from holding lands, but it does not touch the subject; leaving such right, as well as that of voting, to be regulated by state laws, which have without dispute allowed even avowed *aliens* to hold lands. But not only is that right left untouched, but I contend that every law of every state existing at the time of adopting the Federal Constitution, which made an individual a citizen of a state, from the circumstances of his birth, was at once adopted into the national code, and there fixed irrevocably to settle in all future times, beyond the power of any law, except an alteration of the Constitution.

What should constitute a citizen of the United States?

*First.* It is evident some rule or system was adopted to ascertain who were citizens at the time of the adoption of the Federal Constitution, not to be afterwards changed.

1. By Art. I. Sec. 2, § 2, and Sec. 3, § 3, senators and representatives were required to have been for several years citizens of the United States before they had existence, except as a confederacy. And Art. 2, Sec. 5, speaks of a citizen of the United States, at the time of the adoption of the constitution. 2. Congress was authorized to change, by a uniform rule, *aliens* into *citizens,* (U. S. Const. Art. 1, Sec. 8, § 4;) of course, who were to be aliens must have been well understood at the time.

*Second.* What was the rule? 1. It was for the interest of

the nation to adopt a liberal rule. The declaration which made the people of this Northern Confederacy a nation, pronounced obstructions to populating the country on the part of a trans-atlantic ruler, acts of tyranny. The articles of confederation left to each state the privilege of making its own laws on the sub-ject of citizenship, and perhaps this resulted in different regula-tions in all the states. Men became citizens of those states by virtue of those regulations, and they constituted the people of each state.

2d. The citizens of each state were entitled to the privileges of citizens in other states. (Art. 4 of Confederation.) By virtue of that provision, they became *substantially* citizens of the United States, and were recognized as such in the provi-sions of the Constitution requiring representatives and senators (even of the first Congress) under it, to have been for many years citizens of the U. S. ; and in that, which, giving the qualifications of the president, (Art. II. Sec. 1, § 5,) recognizes a distinction between a natural born citizen, and a citizen of the United States.

3d. By embodying those who were citizens of the different states, under these separate laws, in " The People," who de-clare the Constitution to be adopted by them for the purposes set forth in the preamble, the Constitution necessarily adopted the laws which made them so, and irrevocably, except natural-ization laws, which Congress was to have the power of render-ing uniform. It could not be intended that the ancestors were to have privileges which were to be denied to their posterity. That the state of New-York, when it ratified the Constitution, rendered those then living who were born in this state of for-eign parents, citizens of the United States, but none who should thereafter be so born in that state ; in other words, they aban-doned their own municipal law upon matters of internal policy not affecting the national character, and adopted a supposed re-gulation of international law.

4th. That this rule was not the law of nations, is evident from the fact that Congress, composed largely of the framers of the Constitution in 1795, passed a law declaring children of American citizens, born abroad, what by international law they

already were—to wit, citizens; following the policy of England, which passed a statute (7 Ann, ch. 5 and 4,) making the children of Englishmen, resident abroad, British subjects.

*Third.* The objections to this rule are untenable. 1st. It is said that Congress has not declared that children of foreign parents, born here, should be Americans. The answer to this is, that their power consists in naturalizing those who are not, not in fixing standards of citizenship; naturalizing implies a change from one condition to another; but a child becomes a native citizen or an alien as soon as it is born, and is a human being: and it can hardly be born both, though it may be born a citizen of two countries.

2d. It is said a child might be born a citizen of two countries by this rule. So might a child born in England of American parents by the law of the United States, of 1795. So might naturalized persons, for the law of nations as adopted by our national courts forbids expatriation, at all events without consent of the original government or gross oppression. (*United States* v. *Gillies,* Peters' C. C. R. 159; *United States* v. *Williams,* 4 Hall's Am. Law Journal, 361.) When this double duty is divided, in case of treason or desertion, other principles must be applied to govern as to the punishments to be inflicted.

3d. It is said, new states coming into the confederacy bring in their laws. The answer to this is, that this rule having become part of the fundamental institutions of the country, when any new state comes into the Union, as to all born afterwards it must conform to the standard of the old states, and for the future acknowledge none as citizens but such as under the laws of some of the old states, at the time of the adoption of the constitution, would have been citizens. Suppose Louisiana for instance, recognizing the law of nations before her cession, excluded the children of foreign subjects born within its dominions, while New-York adopted them; can it be supposed that a man born of French parents at New-Orleans would be a Frenchman, but at New-York an American? Can there be *"alia lex Roma alia Athenis."* The case of *Inglis* v. *Sailor's Snug Harbor,* in 3d Peters, has not, that I can perceive, any bearing on this rule. There the child was born on territory

which from being a part of the British dominions, by force of arms became an independent country. In such anomalous case, as the child was already like all the inhabitants of the revolted colonies before revolt, a British subject, capable of becoming an American citizen by election, and not *sui juris;* it was held his power of election was kept in suspense for his benefit until he came of age, and then his acts determined his election, otherwise he remained as he was born, a British subject. But here the child is either an American citizen or British subject, when born, and no election can alter it; nor is there any suspense for the purpose of enabling him to elect.

But it is by no means so certain that the law of nations is peremptory on this question of citizenship. Vattel, the only authority cited by the complainant's counsel, says by the *law of nature,* children follow the condition of their father. (*Laws of Nat.* § 215, B. 1, Ch. XIX.) But he says civil and political laws may ordain otherwise, and their regulations must be followed. Now without examining what is this law of nature, which any one is as competent to decide as Mr. Vattel, it is sufficient that he considers citizenship not a right, but an obligation, for the purpose of maintaining the community of the parents, and makes our native soil to be, not our birth place, but that of our fathers or grandfathers. Our courts in the case of *Priest* v. *Cummings,* (16 Wend. 617,) and *Shanks* v. *Dupont,* (3 Peters, 248,) establish citizenship as a personal *right,* so distinguished from an obligation, as to give the wife, whose rights are lost in the unit of the married state in all other respects, the power to change her allegiance and become naturalized, without the consent of her husband. And I do not know that the obligation of a wife to her husband, is less binding than that of child to parent. Vattel notices this peculiarity of the English law. § 214. (And see Viner's Abr. *Alien,* D.) Nor does Vattel mention it with any disapprobation, or as at all clashing with the law of nations.

If we deviate from the common law, and a general law is to be appealed to on account of its fitness, why stop at the law of nations? Why not fall back on general principles where we

Lynch *v.* Clarke.

shall find the place of birth should be the test of citizenship?
1. It is the most easily applied. If you are to go back one
step, and ascertain the birth place and early residence of a father,
nay even a grandparent, the facts relating to a citizenship will be
most difficult to prove or disprove. 2. Parents have control in
some measure over the birth place of a child, they may have none
over those associations under whose influence he may be brought
up. 3. The child's first protector, is the government where it
is born, by its laws it is guarded against violence, and furnished
with the means of subsistence. 4. Any other doctrine is incon-
gruous with the theory of our institutions; of the mutuality of
protection and personal obedience, not hereditary right. 5. As
no man can expatriate himself, the children of foreign parents,
born here, being foreigners, their children are foreigners, and so
on forever.

But even if we take Judge Story's proposed limitation of any
intention to reside here on the part of the parents, which after all
is merely legislative and unsupported by authority; if we exam-
ine the facts in this case, it will be found we are within the rule.
(The counsel then criticised the testimony, and contended that
Patrick Lynch came here with an intention to remain, and
thereby changed his domicil.)

Domicil is a change of the place of residence with the inten-
tion of remaining at such new place, and within the definition,
it seems to me New-York was Patrick Lynch's domicil when
Julia Lynch was born. The fact whether Patrick Lynch was
or was not a naturalized citizen, or declared his intention to
become so, is wholly immaterial, as the intention of living here,
and not of becoming a citizen, is the main point affecting the
domicil.

Upon either of these grounds, therefore, the complainant's
argument is at fault: 1st, That the children born of foreign
parents in this country could not hold lands in this state, or
that such right was ever taken away: 2d, That children so
born are not citizens of the United States: 3d, If an intention
to remain here on the part of the parent was necessary, it is
established in this case.

*Samuel Sherwood,* for the complainant, in reply.

Under the circumstances of Julia Lynch's birth in this coun-
try of alien parents, her remaining some six or eight months,
and then being taken by her parents to Ireland, and remaining
there till after the death of her father, the sole question now
arises; and it simply is, whether Julia Lynch was a citizen of
the United States or a subject of Great Britain, at the time of
Thomas Lynch's death in 1833. · The defendant's counsel con-
tend that by the common law of Great Britain, which has been
adopted in the state of New-York, the place of birth determines
the allegiance and citizenship of Julia; and that the Constitu-
tion of the United States and laws of Congress have not super-
seded or varied the common law.

Now although on the part of the complainant we do not deny
that such was the common law of Great Britain, yet we do deny
that it has any bearing upon what now constitutes an Ameri-
can citizen. It may be difficult to ascertain with precision
what was the common law of Great Britain, or whether, inde-
pendent of the British statutes, the place of birth or parentage
gave national character to the child. Calvin's Case, to which
all refer, does not determine the question, because the point was
not necessarily involved, and *dicta* may be found on both sides
of the question about equally strong. Nor does the leading
case of *Collingwood* v. *Pace,* decide it. The principal point
there was, whether the son could inherit through an alien
father, and it was decided he could not, though the son was
born after the accession of James to the crown of Scotland,
uniting the kingdoms, and therefore a natural born subject.
The elementary writers, Blackstone, Chitty, Kent, &c., say
that an alien is one born out of the king's dominions, " but this
must be understood with some restrictions. The common law
indeed stood absolutely so, with only *a very few exceptions.*"
The exception generally given, is that of the children of ambas-
sadors born abroad, of parents *known to be subjects,* and known
to be abroad with the *animus revertendi,* and with the consent
of the government; and as far as the correct principle can be
extracted, it is and ought to be, that when a citizen of one

country is abroad with the approbation of his government, express or implied, temporarily, with the intention of returning and not changing his allegiance, children born of such parents abroad, and actually returning during infancy, are born *within the ligeance of the government of the parents country*, their national character following the condition of their parent, subject to such allegiance. Such a principle is in harmony with the first law of nature; with the ties of parent and child, and with the reciprocal claims of the goverments, and the rights of the subject or citizen. This principle is affirmed *by the stautes of England*, by the codes of France, and by the *laws of Congress*. It is as far as can be ascertained, the existing law of nations, either barbarous or civilized.

It cannot be denied, that while England claims, if not by the common law, by her statutes, that the children of her subjects, born abroad, are her subjects also; she denies the same right to other nations. She claims that children born in England, of foreign parents, are English. Now, if an American family, travelling or temporarily residing in Europe, should have a child born in England, and after its birth, and in prospect of war between the two nations, the family were ordered to leave the country, would England be permitted to assert her doctrine of *a natural born subject*, and separate the child from the parent, and retain the child as a British subject? Or rather, if the claim were asserted, would not the American government, at the hazard of a national conflict, be bound to protect the child, under the paramount laws of Congress, as an American citizen? If Americans would not permit this claim to be enforced against them, could they be guilty of the absurd and incongruous act of attempting to enforce the rule against others? England also denies the right of expatriation; she claims her subjects, as bound by an indissoluble bond; she admits no residence, temporary or permanent; no acts or declarations, as loosening the chain. The American doctrine takes the converse of the proposition; admits and contends for the right of expatriation. When her citizens renounce their allegiance, they renounce the right to her protection; she yields the one, and they forfeit the other. What precise act severs the bond of

allegiance, or where the exact point of these mutual relations terminate and commence, may not always be easy to determine.

The United States would defend the rights of her naturalized citizens, here or abroad. She would protect the permanent resident foreigners, who had declared their intentions to become citizens, while here in their probationary state, and she would guarantee a safe asylum to any who emigrated to our shores, and sought a permanent residence and a perpetual home among us. This latter class contributing to the support of our government, would to a qualified extent, be entitled to its protection, and perhaps there is no better *American test* of the commencement of this right of protection, than permanent residence with an intention to remain. And it is more reasonable to suppose that England will yield to others what she claims for herself; and that she will conform to a general principle, by which all civilized nations can be governed upon terms of entire equality, and without conflict.

The rapid progress of civilization, the ready and constant intercourse of nations, the mingling of citizens and subjects of all nations without restriction, call for uniform national rules; and can any be more simple and just, than those we contend are to be drawn from the constitution of the United States and the laws of Congress made in pursuance of it? Whatever may have been the rule of any particular state, after severing from the mother country, and while bound by articles of confederation merely, such rule " was virtually repealed" upon the adoption of our federal compact, and a new and "uniform rule of naturalization" was thenceforward to be "established throughout the Untted States," and " the citizens of each state should be entitled to all the privileges and immunities of citizens of the several states." *Chirac* v. *Chirac,* (2 Wheat. 269. Ch. J. Marshall.) Here then was an original plan to govern all the states, abolishing the old, and building up a new system, to which all the states consented, and in pursuance of which, the acts of Congress have been passed, defining and declaring who shall be " *admitted to be citizens,*" upon conforming to prescribed regulations, and who shall be " considered citizens" from their situation without any acts of their own. Adult aliens coming to *reside,* and actually making our land

the land of their homes, and properly manifesting a disposition to be incorporated into the body politic ; to those, citizenship has been rendered simple and uniform ; the adult alien is thus "admitted to be a citizen," and the infant children dwelling here, of such alien, so admitted to be a citizen, are to "be considered citizens." Two other classes by the acts of Congress are "to be considered citizens ;" the widow and children of a man declaring his intention, and dying before naturalization; and children of American citizens born abroad, are "declared citizens."

If an American citizen should go to reside in France with the *animus manendi*, and should live and die there, his children born there, I readily admit, would be natural born subjects, because such intention and continued residence of the parent would be evidence of, and equivalent to, *expatriation*, by implied consent of the government to whom allegiance was due. And although the parent may not have become naturalized so as to entitle himself to all the privileges of his adopted country, yet having cast off allegiance to this country, there is no barrier to the child's allegiance to the country of its birth, and I perceive no objection to the adoption of the same principles here. If a foreigner came to reside here permanently, and designs renouncing all allegiance to the government of which he is a subject and actually remains here, has children *born here*, and they remain ; in such case the parent may be deemed to have *renounced*, with the *implied assent* of his former government, and although not naturalized, and not entitled to the full privileges of a citizen, yet being domiciled and owing a temporary allegiance, his children born here *are natural born citizens*. It is permanent residence, with the intent of remaining, added to birth, which creates and establishes the political character. Without such *permanent residence*, and while the parent is *in itinere*, the place of birth follows the allegiance of the father. Adopt this rule, consider this the law of nations, and there is no conflict or incongruity. It is the sensible doctrine of Vattel and of Story. Our Constitution having abrogated the common law, and Congress having provided for infant children born abroad, and dwelling here *when the father becomes naturalized*, (and if he fails to do so, they may

apply when of age;) and Congress having also asserted the citizenship of children born abroad of American citizens ; with the rule I contend for, and the existing enactments, there is no case unprovided for. Adopt the rules the defendants contend for, and each country is in conflict with the other.

With this rule as our guide, we have only to ask, was the father of Julia an alien ? was his visit here temporary ? did he intend to return home, and did he in fact return home and die there, she *dwelling with him* at the time of his death ? If so, her condition followed his, and she was a British subject. Julia must have *dwelt* here at the time of her father's death, to have taken under the enabling statute, as by that statute she obtained no greater rights than if he had that day been naturalized under the acts of Congress.

THE ASSISTANT VICE-CHANCELLOR.—The first question which I will examine in this case, is the political condition of the defendant, Julia Lynch, at the death of her uncle, Thomas Lynch. This question stands at the threshold of the cause. For if, as is claimed in her behalf, she were in truth a citizen of the United States at that time, she inherited all the real estate whereof Thomas Lynch was seised, or to which he was entitled, either at law or in equity. Her father died in the lifetime of Thomas. The descent to her, (although the other relations of Thomas were aliens,) was not immediate. (*Jackson* v. *Fitzsimmons,* 10 Wend. 9 ; *Levy's Lessee* v. *M'Carty,* 6 Peters, 102.)(*a*) But the Revised Statutes, re-enacting so much of the act 11 and 12 Will. III. ch. 6, provide that no person capable of inheriting under our statute regulating descents, shall be precluded from such inheritance by reason of the alienism of the ancestor of such person. (1 R. S. 754, § 22.) This applies directly to the case, if Julia Lynch were a citizen when her uncle died. (*The People* v. *Irvin,* 21 Wend. 128.)

The difficulty of the subject, and its importance intrinsically, as well as in reference to the large amount of property involved

---

(*a*) And *Descottes* v. *Tabrande,* (2 M'Mullan's So. Car. Rep. 300.)

in this cause, induced me to solicit a further argument on the point, and it has accordingly been argued anew. The respective counsel have presented their views with great ability, and have aided me essentially in my investigation.

The facts bearing upon the alienage or citizenship of Julia Lynch, lie within a narrow compass. (The court here recapitulated the testimony on this point.)

The presumption of Patrick's having had any *animum manendi,* arising from his residing here three or four years, is very much weakened, if not overcome, by his speedy return to Ireland, his constant wish to return during his stay, and the absence of any proof of his expressing an intention, or even expectation of remaining here, or of his taking any step towards acquiring the character of a citizen of the country.

My conclusion upon the facts proved is, that Julia Lynch was born in this state, of alien parents, during their temporary sojourn. That they came here as an experiment, without any settled intention of abandoning their native country, or of making the United States their permanent abode.(*a*) They never concluded to remain here permanently, and after trying the country, they returned to their native land, and there ended their lives, many years afterwards. They took Julia with them to Ireland; she continued to reside there, and when Thomas Lynch died, she was about fourteen years of age, and a resident of Ireland.

Her right to inherit, as the heir of Thomas Lynch, must be tested by the state of allegiance existing at his death, when the descent was cast. It is evident, therefore, that the right depends upon her alienage or citizenship at the time of her departure from this country in her mother's arms, in the year 1819; for no act intervened between that time and the death of Thomas, which could alter her political state or condition.

*First.* It is insisted by the defendants that the rule of the common law is to govern this case on the point of alienage.

---

(*a*) See a strong authority in support of the *animus revertendi, Munro* v. *Munro,* (7 Clark & Fin. 842.)

It is an indisputable proposition, that by the rule of the common law of England, if applied to these facts, Julia Lynch was a natural born citizen of the United States.  And this rule was established and inflexible in the common law, long anterior to the first settlement of the United States, and indeed, before the discovery of America by Columbus.  By the common law, all persons born within the ligeance of the crown of England, were natural born subjects, without reference to the *status* or condition of their parents.  So if a Frenchman and his wife, came into England, and had a son during their stay, he was a liege man.  This was settled law in the time of Littleton, who died in 1482.  (*Litt. Tenures, s.* 198.)  And its uniformity through the intervening centuries, may be seen by reference to the authorities, which I will cite without further comment.(*a*)

Mr. Chitty, where cited, says that by the common law, all persons born out of the king's dominions and allegiance were deemed aliens ; and whatever were the situation of his parents, the being born within the allegiance of the king, constituted a natural born subject.

He states no exception to the latter proposition ; although there are some exceptions to the former, in favor of children of British subjects who are born in foreign countries.  Whether the foreign parents were in England, *in itinere,* or for occasional business, their children born during their stay, were natural born subjects.

*Second.*  Such being the rule of the common law, in the absence of express legislation, the difficult question is presented for decision ; is the common law in this respect, the law of this state, or of the United States ?  If it be the law here, then Julia

---

(*a*) *Dyer's R.* 224 *a ; and S. C. in Jenkins' Cent. Cases,* 5 *Cent. Case,* 91 ; *Calvin's Case,* 7 Reports, 16, 17, 18, 25, 27 ; *Co. Litt.* 8 *a,* 129 *a ; Bacon* v. *Bacon,* Cro. Car. 601 ; *Comyn's Digest, Alien, B.* 1 ; *Bacon's Abridgment, Aliens, A ; 1 Black. Com.* 366 ; *Doe* v. *Jones,* 4 Term Rep. 300 ; *Doe* v. *Ackland,* 2 Barn. & Cres. 779 ; *Chitty's Law of Descents,* 33.  1 *Hallam's Constitutional History of England,* 422, *note* 1.

Lynch was a native born citizen, and inherited the property in controversy; assuming that it was the property of Thomas Lynch, as alleged in the bill of complaint.

It is undoubtedly true that the right to real estate by descent in this state, must be governed by the municipal law of the state. And by the law of this state, which in this respect, is the common law, aliens cannot inherit land. But this does not relieve the case from its difficulty, because we have no state law which in express terms declares who are aliens or who are citizens, either in general, or for the purpose of inheriting land. It thus becomes necessary to inquire who is an alien, according to the laws which must control that subject in this state. No one can dispute the power of this, or any other state in the Union, to regulate the subject of inheritance. The state legislatures, may enable aliens to hold and inherit lands unconditionally, in their respective states. But where they have omitted to legislate, and the common law disability is left to operate against aliens ; the right to inherit, when disputed on this ground, must be determined on some general principle or rule of law, which ascertains who are aliens and who are citizens.

I think that this general principle is not to be obtained from the local or municipal law of the state of New-York. This state is a member of a confederation of states, having a common federal executive head, and for many purposes affecting the general interest and convenience of all the states, a national legislature and judiciary. Our internal affairs and government, are almost exclusively reserved to the control of the people of the states. Amongst ourselves, we are twenty-six sovereign and independent states, confederated under a compact or constitution, for limited and prescribed objects of government.

But in reference to all foreign nations, we stand as one single and united people, *The United States of America.* The right of citizenship, a right which is not only important as between the different states, but has an essential bearing in our intercourse with other nations, and the privileges conceded by them to our citizens, is therefore, not a matter of mere state concern. It is necessarily a *national right* and character. It appertains to us, not in respect to the state of New-York, but in respect of the United States.

Lynch v. Clarke.

In speaking of this right in its proper and enlarged sense, we never say of any one, that he is a citizen of the state of New-York; we say he is a citizen of the United States. Our own constitution recognizes the propriety of this mode of expression, in declaring that no person except a *native citizen of the United States*, shall be eligible to the office of governor. A merchant trading in Europe, and having occasion to resort to treaty stipulations with foreign powers, would neither be recognized or understood, if he should declare that he was a citizen of the state of New-York. It is only in his character as a citizen of the United States, an *American citizen*, as by universal comity we are distinguished from the citizens of other Republics on this continent, that he would be regarded abroad, or received as entitled to the rights and immunities secured to him by the government of his country. I speak now of the relationship of a citizen in its general and enlarged sense. In its particular sense, it is applicable to the rights and duties of our people in and towards the states in which they reside. And in this sense, while a citizen of one state may hold lands in another state, yet he cannot interfere in the elections of the latter, or in any of those rights which from the nature of government belong exclusively to the citizens of such state. As citizens, we owe a particular allegiance to the sovereignty of our own state, and a general allegiance to the confederated sovereignty of the United States.

The provisions of the Constitution of the United States demonstrate that the right of citizenship, as distinguished from alienage, is a national right or condition, and does not pertain to the individual states. And while the Constitution recognizes the particular citizenship which I have mentioned, (*Cooper's Lessee* v. *Galbraith*, 3 Wash. C. C. R. 546,) it is evident that the subject of *alienage* must be controlled by the general, and not by the local allegiance. The Constitution declares that the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states. (*Article IVth, Sec. 2.*) The effect of this clause in the first instance, was to bring within the fold of citizenship of the United States, and thus of each and every state, all who at the time of the

adoption of the Constitution, were by birth, adoption or any of their discordant laws of naturalization, citizens of any one of the thirteen states. (See 3 *Story's Com. on the Constitution*, 674, 5, § 1800.) It made all alike, citizens of the newly organized nation, and in this respect a homogeneous people. And the very necessity for such a provision to bring all upon a common platform, exhibited in the strongest light the absolute need of guarding against different and discordant rules for establishing the right of citizenship in future. We therefore find that one of the first powers conferred upon Congress, was " *to establish an uniform rule of naturalization throughout the United States*." (Article 1, Sec. 8, § 4.)

A few brief considerations, out of many which force themselves upon the mind, will illustrate the position that the right of citizenship in its enlarged sense, was after the adoption of the constitution, not only a national right; but from the nature of the case, it must from thenceforth be governed by the law of the whole nation and the acts of the national legislature. The different colonies, while pursuing the same general policy, had manifested very diverse views in their legislation upon the subject of aliens. The same thing was apparent in the legislation of the respective states, after the declaration of independence, and during the confederation. As early as the year 1782, Mr. Madison strenuously urged the adoption of a uniform rule of naturalization by the states. (Letter to Edmund Randolph, 1 Madison Papers, 161.) If the states were to be left to themselves, the same diversity would doubtless continue under the constitution. One state would foster immigration, and confer on foreigners all the rights of citizens on their landing upon its shores; while another, with the same general object in view, but cherishing the ancient jealousy of aliens, would require a probation of many years, before conferring those privileges upon the emigrant. Then under the clause of the constitution which I have first cited, interminable and harassing conflicts of state jurisdiction would have speedily ensued. These considerations are forcibly illustrated by Mr. Madison and Mr. Hamilton in the Federalist, Nos. 42 and 32. (And see 2 *Madison Papers*, 712; 3 *Story's Com. on the Const.*, 3, § 1098, 1099.)

Lynch v. Clarke.

The clause in the constitution conferring upon congress the power to establish an uniform rule of naturalization, was designed to obviate the various evils which were justly anticipated from leaving the subject of citizenship to the control of the several states. Has it had the intended effect? It certainly has not, if there be any portion of the field of legislation on the subject, left open to the action of the several states.

I will next inquire whether there be any such portion left to the states?

The constitution went into full operation on the fourth day of March, 1789. The first congress assembled under it, at its second session, exercised the power conferred upon that body by the constitution, and on the 26th day of March, 1790, passed an act to establish a uniform system of naturalization. And from that time to the present, there has been one or more acts of congress regulating this subject, constantly in force. After congress exercised this power, it is well settled that it no longer fell within the scope of *state legislation.*

In *Collet* v. *Collet,* (2 Dallas, 294,) decided in 1792, in the U. S. Circuit Court in Pennsylvania, the judges held that the states still had a concurrent power of naturalizing, provided they did not contravene the legislation of Congress. But Judge Iredell expressed a contrary opinion in the same court, as early as 1797, in the *United States* v. *Villato,* (2 Dallas, 370.) And in *Chirac* v. *Chirac,* (2 Wheat. 259,) the Supreme Court of the United States held that the power was exclusively in Congress.

The authors of the Federalist, in the numbers before cited, insisted that the power to naturalize must necessarily be exclusive, else there could be no uniform rule. And it seems now to be conceded on all hands, that it is exclusive.(*a*)

This is not only true in regard to what Congress has legislated upon expressly, but it holds good for what they have omitted. If the subject matter belong to the national legislation, the fact that Congress has covered only a part of the

(*a*) 1 *Kent's Comm.* 424, 2*d ed.; Davis* v. *Hall,* 1 Nott and M'Cord's R., (S. C.) 292; *The State* v. *Manuel,* 4 Dev. & Batt. R., (N. C.) 25; *Rouche* v. *Williamson,* 3 N. Car. Rep., (Iredell's Law,) 141; *Sergeant's Const. Law,* 293 ;. 3 *Story's Comm. on Const.* 3, § 1099 ; *Rawle on the Const.,* 84, 85.

ground, does not warrant any state in legislating over the residue. This principle is well settled, and upon reasons that are unanswerable. (See the authorities last cited, and *Ogden* v. *Saunders*, 12 Wheaton, 213; *Prigg* v. *The Commonwealth of Pennsylvania*, 16 Peters, 539; *Jack* v. *Martin*, 12 Wend. 311; *Golden* v. *Prince*, 3 Wash. C. C. R. 322.) If, therefore, Congress has omitted to provide in express terms, for any case which may arise in regard to naturalization, it must either await the future action of that body, or be controlled by the principles of the general law of the United States.

It is very clear that there is no act of Congress which applies to the case of Julia Lynch. And it is contended on the one side, either that the common law of this state applies to this and the like cases; or if we must look to the national law, that the common law furnishes the rule. On the other hand, it is insisted that the national rule is that of the public law, by which a child follows the *status* of its parents.

And first, as to the common law of this state having control. The application of any law of this state, written or unwritten, to the right of citizenship, would conflict with the reason of the thing as a matter of national concern, and with the powers of Congress under the Constitution. Citizenship, as I have shown, is a political right, which stands not upon the municipal law of any one state, but upon the more general principles of national law. It constitutes national character, not mere territorial designation. If we may refer to the common law of this state to-day, we may to-morrow stand upon our statute law on the same subject; for the state legislature may at any time alter the rule of the common law. Therefore, we may just as well claim that our legislature may by law declare that Julia Lynch was a citizen of the United States, as to insist that the common law of this state declares her to be an alien.

At and before the adoption of the federal constitution, the case was undoubtedly different. When our national independence was declared, the citizens of this and the other states were subjects of Great Britain. Upon the Revolution, they were at liberty to continue their allegiance to the crown and retire from the country, or to remain and adhere to the independent states.

Those who adhered, were from thenceforth citizens of the respective states. Foreigners arriving here, intermediate the declaration of independence and the adoption of the Constitution, became citizens or continued aliens, according to the laws of the several states where they resided; and the children of aliens born here during that interval, became citizens in those states, because, as will presently be shown, the common law was in that respect, the law of all the states.

The articles of confederation between the states, made no provision for naturalizing aliens. Each state was left to its own legislation on that subject; and the laws of the several states in that behalf, prevailed within their own bounds, until the 4th of March, 1789, or until the legislation of Congress in 1790. When the Constitution took effect, therefore, it found the existing mass of citizens of the United States ascertained and defined. It was not necessary to enact any thing farther in reference to those citizens, than was done in the section which gave them immunities as citizens alike in all the states. But as we have seen, it was necessary to provide for the boundless future. State laws and state legislation could not in the nature of things, be longer permitted to define, abridge or enlarge the important privilege of citizenship in the United States. It was purely a national right, and one which must for the future, be governed by rules operating alike upon every part of the Union.

The rights of the then inhabitants of the United States were guaranteed. The rights as citizens, of those who should succeed them, were to be regulated by national law. On every principle of law, whether natural, public, or the common law of England, the children born in this country of those who were citizens of the country, would also be citizens. Hence there was no occasion for the constitution to speak of them. In reference to another class of the future inhabitants of the country—those who were born here of alien parents—it is claimed that the common law continued in force, which will be a subject for inquiry presently. Whether it did or did not, their condition was to be ascertained by a national law. In reference to aliens, legislation would be necessary; and the power to

legislate, was conferred upon Congress. From what has been stated, it follows that such power was intended to be, and necessarily must be exclusive. And being exclusive, it cannot, as we have seen, be controlled by the *unwritten or common law* of one of the states, any more than it can be altered by the statute law of such state. And whether or not the Constitution enabled Congress to declare that the children born here of alien parents who never manifested an intention to become citizens, are aliens or are citizens—it is clear that the decision of that question must be by some general rule of law, applicable to and affecting our whole nation. It must be determined by what may be called the *national law*, as contra-distinguished from the local law of the several states. It is purely a matter of national jurisprudence, and not of state municipal law.

*Third.* The next inquiry is therefore, what is the national law of the United States on this subject?

1. At the formation of our present national government, the common law prevailed as a system of jurisprudence, in all the thirteen states which then constituted the nation. In *Wheaton* v. *Peters,* (8 Peters' R. 591, 658,) Thompson, Justice, said that when the American Colonies were first settled by our ancestors, it was held, as well by the colonists as by the judges and lawyers of England, that they brought with them as a birthright and inheritance, so much of the common law as was applicable to their local situation and change of circumstances ; and that each colony judged for itself, what parts of the common law were applicable to its new condition. (And see *Van Ness* v. *Pacard,* 2 Peters, 137. 144 ; *Patterson* v. *Winn,* 5 id. 233. 241 ; 1 Kent's Com. 472–3, 2d ed. ; *Commonwealth* v. *Knowlton,* 2 Mass. R. 534–5.) Most, if not all of the colonial charters, recognized and provided for the benefits of the common law. Both the former, and the present constitutions of this state declared, in effect, that the common law was the basis of the law of this state. (*Constitution of* 1777, *Art.* 35 ; *Constitution of* 1821, *Art.* 7, § 13.)

I need not dwell more at large upon this unquestionable proposition. It is true that one learned judge has spoken of

the adoption of the common law in the colonies, as being only to a limited extent.   And some have deemed it derogatory to us as a people, to assume that we inherited the common law of England.   It is indifferent whether we say that we inherited the *common law,* or the *principles* of the common law.   There is no doubt but that in all the thirteen colonies, it was the common origin of our jurisprudence.   And any one who will take the trouble to compare the whole mass of statute law of general application, which, up to the era of the revolution, had been enacted in the colony of New-York, with the immense extent of the principles of the common law which were then in actual force and operation here, regulating the rights of persons and property ; will be satisfied that we, as colonists, had drawn almost exclusively from that source ; and with us, at least, the common law had been adopted to no very limited or restricted extent.

2.  As the common law prevailed in all the colonies, and was the basis of their laws and jurisprudence, it follows that all persons born in the colonies while in the ligeance of the king of England, became subjects of the crown of England ; unless it be made to appear, that the rule of the common law was incompatible with the situation of the colonists, or unsuited to their circumstances ; or that it was altered by legislation.

Instead of abridging the rule, all the colonial legislation which has come under my observation, proceeded on the assumption that it was the settled law of the land.   In almost every colony, great efforts were made to promote the introduction of foreigners, by the passage of laws giving to them all the rights and privileges of native subjects in respect of property. And in some colonies, they were, after a very short probation, fully naturalized.   The tendency of the colonial legislation generally, was to increase, in every practicable mode, the number of the inhabitants of the country, and to break down the feudal and early common law barriers against aliens.

Judge Tucker says that an alien in America was entitled to many more rights than an alien in England.   1st. By the very act of emigrating to and settling in America, he became *ipso facto* a denizen, under the express stipulations of the colonial

charters, (or nearly all,) whereby it was stipulated for the better encouragement of all who would engage in the settlement of the colonies, that they and every of them that should be thereafter inhabiting the same, should and might have all the privileges of free denizens, or persons native of England. (See the charter of Queen Elizabeth to Sir Walter Raleigh.) 2d. By the same act of migrating, he had a right, (in Virginia,) to be naturalized under the sanction of a pre-existing law, made not only for the benefit, but for the encouragement of all in a similar situation with himself. The operation of these laws was immediate, not remote. (1 *Tucker's Blackstone*, Part 2, Appendix 99 ; *Laws of Virginia*, ch. 11, ed. 1769.)

So in the colony of New-York, by an act passed in 1683, and by another passed July 5, 1715, all foreigners theretofore residing in the colony who had been freeholders, were to be deemed as having been naturalized ; and all the Protestants of foreign birth then residing in the colony, were declared to be natural subjects, and entitled to all the rights, privileges and advantages of natural born subjects, on taking the oaths of allegiance, &c. (1 *Van Schaack's Col. Laws*, 97–100 ;) and by 14 several statutes passed subsequently, the last of which was in 1773, an immense number of aliens were naturalized by name, on taking the same oaths.

In Pennsylvania, an act for naturalization was passed in 1700 ; and after the British statute, 13 Geo. II., ch. 7, had provided for naturalizing all foreign Protestants then in America, on taking the test oaths, &c. ; the General Assembly of Pennsylvania on the 3d of February, 1742–3, passed an act to naturalize such foreign Protestants as conscientiously refused taking any oath. (See 1 *Laws of Penn.*, Carey & Bioren's ed. 8, 272.)

So in the colony of Delaware, a statute was enacted in 1700, which naturalized all resident foreigners who were settled there at the date of the proprietor's letters patent in 1680 ; and authorized the governor to give certificates of naturalization to all foreigners, on their taking the oath of allegiance, &c. ; and conferred upon them the same rights, privileges, &c., as were enjoyed by any of the *king's natural born subjects*. (1 *Laws of Delaware*, 52, ch. 5. a., ed. of 1797.)

I have already quoted from Judge Tucker in reference to the colonial laws of Virginia upon this subject. Similar acts were passed in that colony in 1680, 1705, and 1769.

In South Carolina a statute was passed March 10, 1696–7, for the *making of aliens free of that province.* It conferred upon them all the rights and privileges of inhabitants born of English parents, on taking the oath of allegiance.

On the 4th of November, 1704, a like statute was enacted, which expressly gave to them the right to vote for members of Assembly, and continued in force for eighty years. In the act regulating the election of members of Assembly, passed in 1721, the same right of voting was declared ; while the qualifications of members was, that they should *be free born subjects* of the British dominions, or a foreigner naturalized by act of parliament. (2 *So. Car. Stat. at Large,* 131, 251 ; 3 *ibid.* 135.)

These examples suffice to show the current of colonial legislation from the earliest periods of our history. And they also show Mr. Dane's error in saying that there were no naturalizations in the colonies before the revolution, but such as took place under the acts of Parliament. (4 *Dane's Abr.* 708, ch. 131, Art. 5.)

In most of the colonial statutes on the subject, will be found recitals, setting forth the importance of encouraging aliens to resort to, and settle in, the colonies, and the great benefits which had already accrued to the colonies from that source, in their advancement in wealth, prosperity and character.

It was made one of the grounds of complaint against the colonies, by those who desired to merge the colonial liberties in the royal prerogative, that by fostering the number and wealth of their inhabitants, they were creating formidable antagonists to English industry, and nursing a disposition to rebellion. (3 *Bancroft's History of the U. S.* 380.) And in the Declaration of Independence, one of the injuries to the · states, which were charged upon the King of Great Britain, was, "He has endeavored to prevent the population of these states ; for that purpose obstructing the laws for naturalization of foreigners ; refusing to pass others to encourage their migra-

tion hither, and raising the conditions of new appropriations of lands."

President Madison, in the debates in the Federal Convention in 1787, declared that America was indebted to emigration for its settlement and prosperity, and that part of America which had encouraged foreigners most, had advanced most rapidly in population, agriculture and the arts. (3 *Madison Papers*, 1300.)

I have referred somewhat at large to the usages and legislation of the colonies, to show that so far from limiting, or abridging in any mode, the common law rule of claiming allegiance and conferring rights as subjects; the whole scope and tendency of their legislation and their acts, were to obtain for their infant communities, all the population, and all the citizens that could be brought within their territory. They invited in all nations to multiply the people, which laboriously employed, are the true riches of any country. With this view, they not merely claimed as citizens all who were born in the British dominions, but transformed into citizens with a prompt and liberal facility, all foreigners who were willing to unite their fortunes with those of the colonists.

It may then be safely assumed, that at the Declaration of Independence, by the law of each and all of the thirteen states, a child born within their territory and ligeance respectively, became thereby a citizen of the state of which he was a native.

This continued unchanged to the time when our National Constitution went into full operation. There is no evidence of any alteration of the rule in any of the states during the period that intervened; and the references which will be made under another head, show conclusively that there had been no intermediate change in their policy.

3. I will next inquire whether there be any common law of the United States, or whether as a nation, we have to any extent, the principles of the common law in force.

Some discrepancies in the opinion of learned judges, and consequent confusion, have arisen from the use of general language when speaking of this subject. For instance, it is said by a judge whose opinion is entitled to great respect, that "it is clear there can be no common law of the United States," and

" the common law could be made a part of our federal system only by legislative adoption." (M'Lean, J., in *Wheaton* v. *Peters*, 8 Peters' R. 591, 658.) He was then speaking of rights of property which are purely questions of state law and regulation, and he applied the rule which had long been established in the United States courts, that where a common law right was asserted, they must look to the state in which the controversy originated. Not that all possible cases, falling within the cognizance of those courts, must or could be thus determined; or that the principles of the common law had no application whatever to the people of the United States and their relations and government as a whole.

A great and well founded jealousy on this point, arose soon after the adoption of the Constitution, in consequence of the federal courts in a few instances, assuming that certain crimes or offences at common law, might be punished as offences against the *United States*, without their being made criminal by act of Congress. This jealousy was strikingly exhibited in the memorable debate in Congress on the judiciary, in the session of 1801–2, when the Judiciary Act of February, 1801, was repealed. Its immediate cause was long since put at rest by decisions against such jurisdiction. ( *United States* v. *Hudson*, 7 Cranch, 32; *The Same* v. *Coolidge*, 1 Wheat. 415; 1 *Kent's Com.*, 339, 2d ed.)

Before the Constitution was adopted, the feeling was generally the other way. Thus in the Colonial Declaration of Rights, adopted unanimously on the 14th of October, 1774, the Congress declared "that the respective colonies are entitled to the common law of England." (*Jour. of Congress*, 1774, p. 27, &c.)

In the convention of the people of Pennsylvania, which was held in November, 1787, to take into consideration the adoption of the Federal Constitution, it was objected because the word "appeals" was used in that instrument, that the *trial by jury* was intended to be given up, and the civil law introduced in its stead. (See *Wilson's Works*, and 4 *Hall's Amer. Law Journal*, 321, 423, 426.) In other states, similar objections were made on account of the omission of common law safeguards and privileges. And this rooted partiality for the com-

mon law, resulted in the adding of the express provisions securing to the people the right of trial by jury, and other common law rights, which are to be found in the amendments to the Constitution of the United States.

The Constitution of the United States, like those of all the original states (and in fact, of all the states now forming the Union, with the exception of Louisiana,) presupposed the existence and authority of the common law. The principles of that law were the basis of our institutions. In adopting the state and national constitutions; those fundamental laws which were to govern their political action and relations in the new circumstances arising from the assumption of sovereignty, both local and national; our ancestors rejected so much of the common law as was then inapplicable to their situation, and prescribed new rules for their regulation and government. But in so doing, they did not reject the body of the common law. They founded their respective state constitutions and the great national compact, upon its existing principles, so far as they were consistent and harmonious with the provisions of those constitutions. A brief reference to the Constitution of the United States will illustrate this idea. It gives the sole power of *impeachment* to the House of Representatives, and the sole power of trying an impeachment to the Senate. *Impeachment* is thus treated as a well known, defined and established proceeding. Yet it was only known to the common law, and could be understood only by reference to the principles of that law. The Congress was authorized to provide for the punishment of *felonies* committed on the high seas, and for punishing certain other crimes. The common law furnished the only definition of *felonies*. The trial of all crimes, except in cases of impeachment, was to be by jury; and the Constitution speaks of *treason, bribery, indictment, cases in equity, an uniform system of bankruptcy, attainder, and the writ of habeas corpus;* all of which were unknown even by name, to any other system of jurisprudence than the common law. In like manner, the amendments to the Constitution make provisions in reference to the *right of petition, search warrants, capital crimes, grand jury, trial by jury, bail, fines,*

NEW-YORK—NOVEMBER, 1844.     653

Lynch v. Clarke.

*and the rules of the common law.* In these instances, no legis-lative definition or exposition, was apparently deemed necessary by the framers of the Constitution. They are spoken of as sub-stantial things, already existing and established, and which will continue to exist. And the legislation of Congress immediately following its adoption, and in which they proceeded to carry out in detail the new system of government, left most of these things to stand upon the same footing that they previously were, the principles of the unwritten or common law. It has never been deemed necessary for Congress to legislate upon the rules of pleading or evidence, or of the construction of statutes or contracts, or upon any of the multifarious rules and princi-ples of law and equity, which have been daily used and applied in civil cases, in the courts of the United States, from the year 1789 to the present day. So of the rules of evidence, and the proceedings in criminal cases. All these principles, rules and forms of proceeding, have been adopted from the common law, as a matter of course, without doubt or question. The few state trials which we have had under our general government, are full of illustrations of this fact.

In 1795, Judge Wilson, of the Supreme Court of the United States, in delivering his charge to the grand jury, in the Virgi-nia Circuit, went into an elaborate dissertation on the jurisdic-tion of the federal courts over crimes, and after enumerating such as he deemed cognizable by the Circuit Court, he con-tinued as follows : "In the foregoing catalogue, murder, man-slaughter, robbery, piracy, forgery, perjury, bribery, and extor-tion, are mentioned as crimes and offences ; but they are neither defined nor described. For this reason, we must refer to some *pre-existing* law for their definition or description. To what pre-existing law should this reference be made ? This is a ques-tion of immense importance and extent. It must receive an answer, but I cannot, in this address, assign my reasons for the answer which I am about to give. The reference should be made *to the common law.* To the common law, then, let us resort for the definition or description of the crimes and offences which in the laws of the United States have been named, but have not been described or defined. You will in

this manner, gentlemen, be furnished with a legal standard, by the judicious application of which you may ascertain with precision the true nature and qualities of such facts and transactions as shall become the objects of your consideration and research." (3 *Wilson's Works*, 357, 371.) And in the debates on the judiciary in 1802, to which I have before alluded, Mr. Bayard, of Delaware, in an able speech in the House of Representatives, said on this subject, (what was not disputed, so far as facts were concerned,) that " the judges of the United States have held generally that the Constitution of the United States was predicated upon an existing common law. Of the soundness of that opinion I never had a doubt. I should scarcely go too far were I to say, that, stripped of the common law, there would be neither Constitution nor government. The Constitution is unintelligible without reference to the common law. And were we to go into our courts of justice with the mere statutes of the United States, not a step could be taken, not even a contempt could be punished. There would be no form of pleading, no principles of evidence, no rule of property. Without this law, the Constitution becomes a dead letter. For ten years it has been the doctrine of our courts, that the common law was in force." (*Debates on the Judiciary*, 1802, p. 372. And see 1 *Story's Com. on the Const.* 140, 141, § 157, 158, and note 2; 2 *Ibid.* 262 to 267, § 794 to 797; *Rawle on the Const.* 258.)

Mr. Du Ponceau, in his well reasoned and clear illustration of the jurisdiction of the federal courts, comes to the conclusion: " 1. That the common law is the law of the United States in their national capacity, and is recognized as such in many instances, by the Constitution of the United States, and the statutes made in pursuance of it." 2. That those courts can derive no *jurisdiction* from the common law. 3. That in the territories of the United States, they have common law jurisdiction. (*Du Ponceau on Jurisd.* 101 ; and see *Ibid.* 86, 88; and pp. 10, 15, of the Preface.)

In my judgment there is no room for doubt, but that to a limited extent, the common law, (or the principles of the common law, as some prefer to express the doctrine,) prevails in

the United States as a system of national jurisprudence. To what *extent* it is applicable, I need not hazard an opinion, either in general terms or in particular instances, beyond the case in hand. But it seems to be a necessary consequence from the laws and jurisprudence of the colonies and of the United States under the articles of confederation; that in a matter which, by the Union, has become a national subject, to be controlled by a principle co-extensive with the United States; in the absence of constitutional or congressional provision on the subject, it must be regulated by the principles of the common law, if they are pertinent and applicable.

The power of naturalization is one of the express concessions from the states to the United States. The right of *citizenship*, aside from naturalization, was either a known and recognized right, as applicable to the then and future inhabitants of the country, or necessarily, and by the very act of organizing the nation, became a subject of national law and regulation. It could no longer continue a state right in its enlarged sense as applicable to the United States.

4. The Constitution of the United States contains no clause declaring who shall be deemed citizens, and as I have already observed, there is no act of Congress which applies to the case of Julia Lynch. The necessity for a rule or principle applicable to this subject, and co-extensive with the nation, has existed ever since the adoption of the Constitution, and cases to which it is applicable, have been arising constantly since that period. The states parted with their control of the matter to the federal government. Therefore there must have been a national principle or rule of law, coeval with the existence of the Union governing the subject. And the question whether Julia Lynch was or was not a citizen, must be determined by the national unwritten law.

5. It is a necessary consequence from what I have stated, that the law which had prevailed on this subject, in all the states, became the governing principle or common law of the United States. Those states were the constituent parts of the United States, and when the Union was formed, and further state regulation on the point terminated, it follows, in the absence of a

declaration to the contrary, that the principle which prevailed and was the law on such point *in all the states*, became immediately the governing principle and rule of law thereon in the nation formed by such union. If there had been any diversity on the subject in the state laws, it might have been difficult to ascertain which of the conflicting state rules was to become, or did become, the national principle. And if such diversity had existed, it is reasonable to believe that the framers of the Constitution would have borne it in mind, and enacted a uniform rule, or authorized Congress to establish one. The entire silence of the Constitution in regard to it, furnishes a strong confirmation, not only that the existing law of the states was entirely uniform, but that there was no intention to abrogate or change it. The term *citizen*, was used in the Constitution as a word, the meaning of which was already established and well understood. And the Constitution itself contains a direct recognition of the subsisting common law principle, in the section which defines the qualification of the President. "No person except a *natural born citizen, or* a citizen of the United States at the time of the adoption of this Constitution, shall be eligible to the office of President," &c. The only standard which then existed, *of a natural born citizen*, was the rule of the common law, and no different standard has been adopted since. Suppose a person should be elected president who was native born, but of alien parents, could there be any reasonable doubt that he was eligible under the Constitution ? I think not. The position would be decisive in his favor, that by the rule of the common law, in force when the Constitution was adopted, he is a citizen.

Moreover, the absence of any avowal or expression in the Constitution, of a design to affect the existing law of the country on this subject, is conclusive against the existence of such design. It is inconceivable that the representatives of the thirteeen sovereign states, assembled in convention for the purpose of framing a confederation and union for national purposes, should have intended to subvert the long established rule of law governing their constituents on a question of such great moment to them all, without solemnly providing for the change

in the Constitution ; still more that they should have come to that conclusion without even once declaring their object.   And what is true of the delegates in the convention, is equally applicable to the designs of the states, and of the people of the states, in ratifying and adopting the result of their labors.

Much stress was laid in the very able argument in behalf of the complainant, on the rigorous and grasping character of the rule of the common law ; and the absurdity of the doctrine by which it claims as a subject every human being who happens to draw his first breath upon British soil, while it exacts the same allegiance from the children of British subjects born in foreign countries.   And it was urged, that the United States, a government based upon perfect freedom and equality, should adopt, and intended to adopt and establish, what was called in the argument, the more just, rational and liberal principle of the international and public law.   In this connection the much vexed question of the right of expatriation, was pressed into the argument ; and it was urged that if we adopt the common law rule of allegiance by birth, we must also adopt that of perpetual allegiance, which it was said, has been repudiated in this country.   The authorities in our courts are much divided upon that question, and many which are of great weight, are adverse to the right to expatriate.   1 do not intend to discuss that great question in any of its aspects.   It does not stand upon the same reason or principle as the common law doctrine of allegiance by birth, and does not follow from the adoption of the latter.   A diversity of opinion and of practice on the subject of perpetual allegiance prevailed in the colonies and in the states, under the old Confederation.   The right to expatriate was recognized in Pennsylvania and Virginia, while they were ·colonies.   The Constitution of Pennsylvania prohibited the passage of laws restraining emigration from the state ; and Virginia enacted a law as recently as the year 1792, providing for expatriation and prescribing its forms.   Kentucky, the daughter of Virginia, followed her doctrines in this, as well as in many other questions of national policy.   (*Alsbury* v. *Hawkins*, 9 Dana, 178.) This diversity prevailing in the colonies and states prior to 1789, would afford strength to the argument that in the na-

tional government, the common law rule of perpetual allegiance did not prevail; while the universal prevalence of the rule of allegiance by birth in all the colonies and states up to that time, would be a convincing argument that such rule became the national law.

In regard to the effect of birth upon the right of citizenship, it is my duty not to *establish* the rule of law for the first time, but to ascertain a rule which has been in force from the era of the Federal Constitution, and which has affected the rights of persons and property constantly from that period to the present. Were this, however, to be determined solely on its intrinsic propriety and adaptation to our circumstances, I am not sure that any rule different from that of the common law, ought to be adopted in our country. It is indispensable that there should be some fixed, certain and intelligible rules for determining the question of alienage or citizenship. The place of nativity furnishes one as plain and certain, and as readily to be proved, as any circumstance which can be mentioned. If we depart from that, and adopt the rule of some of the continental nations, we have two more remote and difficult tests introduced. We are to ascertain first, by evidence of facts removed one generation from the time of the inquiry, the *status* or citizenship of the parents at the time of the birth of the *propositus ;* and next, the election or intention of the *propositus* himself, in reference to his adoption of the country where he was born, or that of which his parents were citizens. And sometimes, as in this case, the question will arise, before he attains to the age of election. In harmony with the certainty of the common law rule respecting natives born, are our statutory provisions for the admission of aliens to the rights of citizenship. Such admission is a judgment of a court of record. Thus in almost every instance, we have an unerring guide or test, capable of ready investigation and authentication. The exceptions are the children of ambassadors, (who are deemed to be born within the allegiance of the sovereign represented,) and the children of our own citizens born abroad.

And this brings me to another of the objections to the rule of the common law, viz : That while Great Britain claims as sub-

jects, all born in her dominions, she claims the children born elsewhere of her own subjects; and that we, holding to the common law rule, are subjected to great inequality in this grasping and selfish game, because our act of Congress, declaring the children of our citizens born abroad to be citizens of the United States, is limited to the children of parents who were citizens when it passed, in 1802, and is nearly spent in its operation.

The inconsistency of holding that Julia Lynch is a citizen here, when it is conceded on all hands that by reason of her parents being British subjects she is also a British subject; was strongly urged. This inconsistency, however, is nothing but the occurrence of a *double allegiance*, which exists in the tens of thousands of instances of our naturalized citizens, who were once subjects of the crown of Great Britain. We recognize its existence, because we adopt them as citizens, with full knowledge that by the law of their native country, they never can put off the allegiance which they owe to its government.

With regard to the act of 1802, I do not think that the children of our citizens born abroad, are aliens. Not that I subscribe to the argument of the complainant's opening counsel, that the terms of the act itself embrace the children of all future citizens. But as at present advised, I believe it to have been the common law of England that children born abroad of English parents, were subjects of the crown. The statute, 25 Edward III., st. 2, *De natis ultra mare*, appears to have been declaratory of the old common law. In *Dyer's Reports*, 224 *a*, *note*, it is said to have been adjudged in the King's Bench in 7th Edward III., that children of subjects born beyond the sea, in the service of the king, shall be inheritable; and that this was resolved in parliament in the 17th Edward III. The fact of being in the king's service, does not import being in his dominions, or within his ligeance. It was Lord Bacon's opinion that the act was declaratory of the old common law. Mr. Reeves says it was made to remove some doubt which was entertained about the denization of children born of English parents out of the kingdom. (2 *Reeves' Hist. of the English Law*, 400.) In *Bacon* v. *Bacon*, (Cro. Car., 601,) two of the udges, Croke and Brampton, held that by the common law, a

child born in Prussia of English parents, was a denizen, entitled to inherit and a liege subject. Berkeley, J., said it was rather by force of the statute 25 Edward III. In *Doe dem. Thomas* v. *Ackland*, (2 B. & C., 779, 790 to 793,) Ch. J. Tindal says, that this was so by the common law, and to that effect he cites Hussey, Justice, in 1 Rich. 3, 4. Parke, Justice, in the same case, says that the 25 Edward III., was a declaratory act. (And see 22 Hen. VI., 38, per Newton, J.) Chancellor Kent appears to, entertain the same opinion. (2 *Kent's Com.*, 50, 51, 2d ed.)

If such were the common law, it was in force in the colonies, and was one of the rights which the citizens of the United States retained and still hold under the Constitution. The provisions in the acts of Congress of 1790, 1795 and 1802, to secure these rights to children born abroad, were in this view a superabundant caution. But the circumstance of two different national legislatures having passed such laws, is strong proof that they did not suppose the natural or public law controlled the case. For the very principle of public law which is insisted on here to establish the alienage of Julia Lynch, *Proles sequitur sortem paternam*, would apply to the cases provided for in these acts of Congress. If the common law was considered in force on this subject, the national legislature might well act upon the doubt which prevailed as long ago as the time of Edward III., in regard to children born abroad of citizen parents, and which has ever since prevailed. But in the civil and public law, if the complainant's ground be tenable, there was no doubt whatever.

In reference to the argument that the United States should establish a rule on proper principles, and which shall be just to other nations, it may be said that this is purely a matter of municipal regulation, in every country. Vattel treats it as being legitimately within the control of each nation acting for itself. The rule of the common law is not unjust to other nations, in claiming as citizens those who are born here under the protection of our institutions and government. The other rule is more liable to the charge of injustice, viz : claiming as American citizens those born in other countries of American parents.

Yet no one questions, that justice to our own citizens demands this principle.

The monopolizing spirit of the British nation was alluded to. We have inherited a goodly portion of the Saxon and Norman thirst for territorial and national aggrandizement; and we may, as we have heretofore done, gratify it to the enlargement of the bounds of civil liberty, and of the happiness of mankind. And the adoption of both of the rules of the common law which I have discussed, while they promote those noble objects, do no injustice to other nations. The principal foreign nation affected by those rules, if applied in our country, is Great Britain. Both rules are in full force there, as against our own people and government. And there is a moral certainty that their law, fastening the duty of allegiance upon the simple circumstance of nativity in their dominions, which has been undisturbed for centuries, will never be changed. Why then should the United States make a change, which, if it were ever so desirable, can never be reciprocal?

The policy of our nation has always been to bestow the right of citizenship freely, and with a liberality unknown to the old world. I hold this to be our sound and wise policy still, notwithstanding the religious intolerance which partially obscured it in some of our colonial legislation, and the hostility which has occasionally, and even recently, prevailed against it in some parts of our country. And I cannot refrain from expressing the more surprise at this partial relapse from the progressive and ameliorating influence of free institutions, and of the immense increase of commercial and literary relations and intercourse between different countries, because it is contemporary with the passage of a law in Great Britain, strongly indicative of the force of those influences, and at a single step making greater progress than she has made on that subject for nearly 500 years. I refer to the act to amend the laws relating to aliens, passed August 6th, 1844. (Stat. 7 and 8 Vict., sess. 4th, ch. 66.) An act which, in its concessions to aliens, goes far beyond most of the existing legislation in this country.

Some evidences of the colonial encouragement to foreigners have been mentioned. The same principle has animated the

legislation of the states down to the present day. In Pennsylvania and North Carolina, it was made, in the first instance, a *constitutional provision*. In Illinois, the Constitution confers on aliens the right of suffrage. (*Spragins* v. *Houghton*, 2 Scammon's R. 370.) In truth, the celebrated *Ordinance*, passed July 13, 1787, "For the government of the territory of the United States, northwest of the Ohio River," permitted alien inhabitants to vote, if they were freeholders. (3 *Story's Laws of the U. S.*, 2073—2075; *Spragins* v. *Houghton*, 2 Scam. 377, 393, 399.) The same policy was continued throughout our national legislation in regard to that territory. The same class of aliens was authorized to vote for members of the conventions to form the state government of Ohio in 1802, of Indiana in 1816, and Illinois in 1818. When Illinois was made a separate territory in 1812, aliens who paid taxes and resided a year, were constituted voters. And Michigan was admitted into the Union in 1836, with a Constitution which permitted all aliens then residing there to vote, and which was approved by Congress. (2 *Story's Laws U. S.* 869, 1250 ; 3 *Ib.* 1565, 1674 ; 4 *Ib.* 2442.)

In this state, naturalized citizens are eligible to every public office, except that of governor. In most of the states, laws have been enacted to give to aliens all or most of the rights of citizens, in respect of the acquiring, holding, and transmission of property ; and I believe in all of the states, there are frequent instances of such laws for the benefit of particular aliens and classes of aliens ; while in several of them, the disability to inherit lands is entirely done away.

Without taking time to enumerate all the additional statutory evidences of this prevalent colonial and national policy which are before me, I will refer to our statutes of February 28, 1789. (2 *Greenleaf's Laws*, 279 ;) and of March 26, 1802, ch. 49, (3 *Kent and Rad.* 46 ;)(a) the statute of treason in Massachusetts, in 1777, 2 *Mass. Laws*, ed. of 1801, p. 1046 ; act of

---

(a) The act "to enable resident aliens to hold and convey real estate, and for other purposes," passed April 30, 1845, *Laws of N. Y. Session of* 1845, chap. 115 ; has much enlarged the privileges of aliens in regard to real estate.

June 11, 1788, ch. 174, b. in Delaware, 2 *Laws of Del.* 921 ; acts of March 26, 1784, and March 22, 1786, in South Carolina ; (4 *So. Car. Statutes at Large*, 600, 746.)

Our policy, in this respect, and its happy results, were forcibly vindicated in the convention of 1787, by Dr. Franklin, Mr. Madison, Gen. Hamilton and Judge Wilson. (3 *Madison Papers*, 1273, 1299 ; 1 *Wilson's Works*, 163 ; 2 *ibid.* 446 to 450. And see the *Message of President Jefferson to Congress*, Dec. 8th, 1801.)

With these various and conclusive illustrations of the uniform, wise and beneficial policy of the United States, for nearly two centuries past ; a policy which embraced every legitimate means for increasing the number, not merely of its inhabitants, but of its *citizens ;* it is impossible to hold that there has been any relaxation from the common law rule of citizenship by means of birth within our territory.

6. Upon principle, therefore, I can entertain no doubt, but that by the law of the United States, every person born within the dominions and allegiance of the United States, whatever were the situation of his parents, is a natural born citizen. It is surprising that there has been no judicial decision upon this question. None was found by the counsel who argued this cause, and so far as I have been able to ascertain, it never has been expressly decided in any of the courts of the respective states, or of the United States. This circumstance itself, in regard to a point which must have occurred so often in the administration of justice, furnishes a strong inference that there has never been any doubt but that the common law rule was the law of the land. This inference is confirmed, and the position made morally certain, by such legislative, judicial and legal expositions as bear upon the question. Before referring to those, I am bound to say that the general understanding of the legal profession, and the universal impression of the public mind, so far as I have had the opportunity of knowing it, is that birth in this country, does of itself constitute citizenship. Thus when at an election, the inquiry is made whether a person offering to vote is a citizen or an alien, if he answers that he is a native of this country, it is received as conclusive that he is

a citizen. No one inquires farther. No one asks whether his parents were citizens or were foreigners. It is enough that *he was born here*, whatever were the *status* of his parents. I know that common consent is sometimes only a common error, and that public opinion is not any authority on a point of law. But this is a question which is more important, and more deeply felt, in reference to political rights, than to rights of property. The universality of the public sentiment in this instance, is a part of the historical evidence of the state and progress of the law on the subject. It indicates the strength and depth of the common law principle, and confirms the position that the adoption of the Federal Constitution wrought no change in that principle.

The legislative expositions speak but one language on this question. Thus the various acts on the subject of naturalization which have been passed by Congress, pre-suppose that all who are to be benefitted by their provisions were born abroad. They abound in expressions of this sort, viz: the country "from which he came;" all " persons who may arrive in the United States;" the country whence they migrated is to be stated, and the like. This language is inappropriate to a person who was born here, and wholly inapplicable to one who has always resided in the country. If Julia Lynch had remained here till she was of age, the argument in regard to her citizenship would be no different, because during the intervening time she would have been incapable of election. In this state, the constitution adopted by the people in 1822, provides that no person except *a native citizen of the United States* shall be eligible to the office of Governor. *Native citizen* is used as contradistinguished from citizens of foreign birth, and as a term perfectly intelligible and definite. It is based upon the assumption that there was a known rule of law, ascertaining who were native citizens of the United States ; and as has already been shown, there was no such rule known, except that of the common law. In various statutes which have been enacted from time to time for more than fifty years past, to authorize aliens to take, purchase, hold and convey real estate, the expression used by the legislature in de-

claring the extent of the rights granted, is that they are to be as full as those of "any natural born citizen," or of "natural born citizens." (See *Laws of* 1806, ch. 164, § 1, 3; *of* 1807 ch. 123; *of* 1808, ch. 175; *of* 1812, ch. 240; *of* 1825, ch. 310; 1 *Rev. Stat.*, 720; and many others, both general and particular in their application.) In one statute, passed April 28, 1836, *Laws of* 1836, ch. 200, the alien was to hold land as fully as if he had been a naturalized or natural born citizen; as if those two constituted all the classes of citizens known to our laws. In the numerous colonial statutes of naturalization to which I have already referred, the expression which is used, is "*natural born subjects.*" Both expressions assume that birth is a test of citizenship; and the continuance of the language subsequent to the Revolution and to the Federal Constitution, shows that the effect of birth continued to be the same as it was before.

The statutes in favor of aliens, enabling them to take, hold and dispose of real estate, have been very general throughout the United States. I refer to the following as exhibiting the similar use of the term "natural born citizen of the United States," in contradistinction to aliens, or foreigners not naturalized. In New-Jersey, the act of January 22, 1817. (*Elmer's Digest*, 6.) In Pennsylvania, the act of February 11, 1789; which says natural born *subjects*, instead of citizens. This act was continued in 1792, and again in 1795. (3 *Carey & Bioren's Laws*, 299.) In 1799, a similar statute, using the same language as in those of New-York, (6 *ib.* 38.) So in 1807, (Act of February 10th); and again March 24, 1818, (*Purdon's Digest*, 39, 40, ed. 1836.) In Delaware, Act of 1811, ch. 172; 4 *Laws of Delaware*, 483. On the 11th of June, 1788, a statute was enacted in Delaware, giving to all foreigners then or thereafter residing there, on taking the oath prescribed, all the rights and privileges "of *natural born subjects* of this state," except the holding of offices, to which they were entitled after five years residence. (2 *Laws of Del.* 921, ch. 174, b.) For similar laws, using the same language, see *Laws of Georgia to* 1820, p. 182, Act of Feb. 7, 1785; *Revised Statutes of Indiana*, 1838, p. 67; *Rev. Stat. of Wis-*

*consin*, 1838–9, p. 179; *Laws of Michigan*, ed. 1833, p. 282, Act of March 31, 1827.

In Pennsylvania, the old plan or frame of government, adopted at the Revolution, (sec. 42,) gave to every foreigner of good character who came to settle in the state, having first taken the oath of allegiance, the right to hold land, &c., and after one year's residence he was to be deemed a free denizen of the state, " and entitled to all the rights of a *natural born subject*" of that state. (1 *Carey & Bioren's Laws of Pa.* 8, *note a.*) In a statute of that state, passed August 31, 1778, to give validity to titles, &c., it was enacted that heirs of persons not naturalized, or *born out of the allegiance* of the crown of Great Britain, might hold, &c., as if the deceased had been born in allegiance, &c. (*Purdon's Digest*, 38.) The same assumption in regard to citizenship by birth, is to be found in the statute of Pennsylvania regulating elections, passed February 15, 1799 : In order to prove his right to vote, the elector is to take an oath, 1. That he is a natural born citizen of the state, &c. 2. Or that he is a natural born citizen of some other of the United States, &c. Or 3. That having been a foreigner or alien, he has been naturalized, &c. ˙ (*Purdon's Dig.* 223 ; 3 *Carey & Bioren*, 340.)

The Constitution of Vermont, adopted July 4, 1793, (§ 39,) contained a provision like that of the Pennsylvania frame of government, except that the limitation as to holding offices was restricted to the highest in the state, and as to those, was at an end after two years residence. The same words were used to illustrate the rights conferred, viz. : " *natural born subjects of this state.*"

In Virginia, an act was passed in 1792, entitled " an act declaring who shall be citizens of this commonwealth," and providing for acquiring and relinquishing the right of citizenship. The first section provides, " That all free *persons born within the territory of this commonwealth ;* all persons *not being natives,* who have obtained a right of citizenship under former laws, and also all children, wheresoever born, whose fathers or mothers are or were citizens at the time of the birth of such children, shall be deemed citizens of this common-

wealth," &c. (1 *Rev. Code of Va.* 1819, p. 65. And see *Barzizas* v. *Hopkins*, 2 Randolph's Rep. 278, 281, 282.) This was a substantial re-enactment of a statute passed in May, 1779, ch. 55; (except that the latter was limited to free *white* persons,) another in October, 1783, ch. 16, 17; and another in October, 1786, ch. 10. These statutes in Virginia were in part declaratory.—They were enacted, because of the confusion and doubts on the subject growing out of the Revolution, and the adherence of some of the colonies to the British government, their subsequent return in some instances, and that of their children in others.

In South Carolina, the act of 1721, prescribing the qualification of members of the assembly, required them to be "*free born subjects*," of the British dominions. (3 *So. Car. Statutes at Large*, 137, § 8.)

In Tennessee, a statute passed in 1819, recites that the policy of the United States has always been to encourage emigration from foreign countries, to increase their population and strength ; and the act enables aliens to take by descent. The first section commences thus : "*All persons not having been born in the United States*, or otherwise citizens thereof," &c. And they are to hold, &c., as if they had been "*native citizens*" of the United States. (*Statute Laws of Tenn. by Caruthers and Nicholson*, ed. of 1836. p. 87.)

These instances from the constitutions and statutes of the various states might be multiplied to a great extent. Those already given, will suffice to show that the universal understanding of the representatives of the people of the states in establishing their fundamental and statutory laws, was that every person born within their territory, was by that circumstance alone, a citizen ; and in some of the states, the recognition of the doctrine is express.

I find an illustration of the point by negative testimony, in the state papers which grew out of the memorable and atrocious outrage committed by the British ship Leopard on the U. S. frigate Chesapeake, in June, 1807. It was alleged that three of the seamen taken from the Chesapeake, were American citizens. Not that their national character made any differ-

ence in the principle involved in that affair, but it aggravated the atrocity of the conduct of the British commander. The proofs of the fact of citizenship which were reported by the committee of the House of Representatives, and which were furnished to the British government, consisted of evidence of the birth and subsequent lives of the seamen, one of whom was born in 1784. Nothing was stated in regard to the condition or allegiance of their parents, in any of the reports or correspondence on the subject. It was evidently taken for granted that birth in one of the states, without regard to parentage, constituted those seamen, citizens of the United States. (*Wait's American State Papers*, 1806, 1808, pages 197, 200, 220, 225, &c.) And see the correspondence between Mr. Madison and Mr. Monroe; Mr. Monroe and Mr. Canning; and Mr. Madison and Mr. Rose. (*Ib.* 284, 301, 349.)

I will next recur to other legal and judicial authorities on this subject.

Chancellor Kent follows Blackstone in his division of the inhabitants of our country into *aliens and natives*. And he says : " Natives are all persons born within the jurisdiction of the United States ;" and "an alien is a person born out of the jurisdiction of the United States." The exceptions which he makes, do not affect the present question. (2 *Kent's Com.* 39, 49, 2d ed.)

Judge Wilson in his law lectures, delivered soon after our national government was organized, says that an alien, according to the notion commonly received as law, is *one born in a strange country*, and in a foreign society, to which he is presumed to have a natural and a necessary allegiance. He also says, that between a subject natural, and a subject naturalized, the distinction as to private rights is merely nominal : on one they *are devolved by his birth*, on the other by the consent of the nation. (2 *Wilson's Works*, 448, 449.) Speaking of the English rule of law against expatriation and its applicability, he says, " the reasons in favor of it are, that *every citizen as soon as he is born*, is under the protection of the state, and is entitled to all the advantages arising from that protection ; he therefore owes obedience to that power, from which the protec-

Lynch *v.* Clarke.

tion which he enjoys is derived. But while he continues in infancy and nonage, he cannot perform the duties of obedience. The performance of them must be respited, until he arrive at the years of discretion and maturity. When he arrives at those years, he owes obedience, not only for the protection which he then enjoys, but also for that which from his birth, he has enjoyed." (1 *Wilson's Works*, 313.)

Judge Tucker says, that " Aliens in the United States are at present of two kinds—aliens by birth and by election. First. Aliens by birth are all persons born out of the dominions of the United States, since the 4th day of July, 1776, with some few exceptions, as children of citizens born abroad, and persons naturalized by acts of Congress," &c. His second class of aliens, are those made by voluntary expatriation, which he insists is reasonable. (1 *Tucker's Blackstone, Part 2, Appendix*, 101.)

Mr. Dane says, " An alien owes a local allegiance while in the country, and is there protected ; *and he is one born under a foreign allegiance.*" (4 *Dane's Abr.* 695 ; *Estate by Aliens*, chap. 131, art. 1.) To the same effect, see Duer's Outlines of the Const. 168, § 652.

Mr. Rawle says explicitly : " Every person *born within the United States*, its territories or districts, *whether the parents are citizens or aliens*, is a *natural born citizen*, within the sense of the Constitution, and entitled to all the rights and privileges appertaining to that capacity." (*Rawle's View of the Constitution of the United States*, 86.)

Other authorities to the same point are, 1 *Bouvier's Law Dictionary*, title *Alien*, p. 98, and *Allegiance*, p. 99. He says natural allegiance is such as is due from all men born within the United States ; and an alien is one born out of the jurisdiction of the United States, who has not since been naturalized under their constitution and laws. So in Dr. Lieber's *Encyclopædia Americana*, title *Alien*, it is said that by the laws of England and the United States, an alien may be defined to be a person born out of the jurisdiction of the country, and not having acquired the rights of a citizen by naturalization. The exceptions made in these books need not be repeated.

In the case of the *United States* v. *Williams*, (4 Hall's

Amer. Law Journal, 361,) on an indictment tried in the U. S. Circuit Court in Connecticut, September, 1799, Chief Justice Ellsworth, speaking of another branch of this subject, expatriation, says, "the common law of this country remains the same as it was before the revolution." He then applies it to the case before him, as to which case I need make no remark.

In the *United States* v. *Gillies*, (1 Peters' C. C. R. 159,) the same subject came before Judge Washington, in the U. S. Circuit Court, in 1815, and he expressed his opinion strongly against the right to expatriate. He said, a citizen of the United States may obtain a foreign domicil which will impress upon him a national character for commercial purposes, &c., "but he does not on this account lose his original character, or cease to be a subject or citizen of the country where he was born, and to which his perpetual allegiance is due."

In *M'Creery* v. *Somerville*, (9 Wheaton, 354,) the question arose on the right of three daughters of R. M'Creery, an alien not naturalized, to inherit as heirs of their deceased uncle, W. M'Creery. The case stated the daughters to be native born citizens of the United States, and the argument and judgment proceeded on that assumption. It was, therefore, a conceded point by the counsel and the court, that the children born here, of alien parents, are native born citizens.

Mr. Justice Story, in his opinion in *Inglis* v. *The Sailor's Snug Harbor*, (3 Peters, 155,) says : "Allegiance by birth is that which arises by being born within the dominions, and under the protection of a particular sovereign. Two things usually concur to citizenship; first, birth locally within the dominions of the sovereign; and secondly, birth within the protection and obedience, or in other words, within the ligeance of the sovereign."

The judgment of Chief Justice Parsons, in *Ainslie* v. *Martin*, (9 Mass. R. 456, 457, &c.) is full of instruction on this subject. He says : " Our statutes recognize alienage and its effects, but have not defined it. We must therefore look to the common law for its definition. By this law, to make a man an alien, he must be born without the allegiance of the commonwealth ; although persons may be naturalized or expatriated by statute,

or have the privileges of subjects conferred or secured by a national compact."

Again, speaking of the colonies renouncing their allegiance to the king, he says: " Until that renunciation, the people of the province of Massachusetts Bay considered themselves as constituting a political corporation, which possessed exclusively the powers of legislation, which acknowledged the king of Great Britain as sovereign, possessing all the rights, privileges, and prerogatives of sovereignty ; among which was the right of claiming the allegiance of all persons born within the territory of which he was sovereign." That the people, in union with those of the other colonies, considered the aggressions of their sovereign on their essential rights as amounting to an abdication of his sovereignty. And thereupon the people assumed to themselves, as a nation, the sovereign power, with all its rights and prerogatives. Thus the government became a republic, possessing all the rights vested in the former sovereign ; among which was the right to the allegiance of all persons *born within the territory* of the province of Massachusetts Bay.

The Chief Justice further says: " It was therefore then considered the law of the land, that all persons born within the territories of the government and people, although before the declaration of independence, were born within the allegiance of the same government and people, as the successor of the former sovereign, who had abdicated his throne." " And as the inhabitants of England, born in the reign of the second James, were considered as born within the allegiance of his successor, William the Third ; because born in the territory of which he was the sovereign, he having succeeded by Parliamentary designation, so all persons born within the territories of the province of Massachusetts Bay, during the reign of the late king, are considered as born within the allegiance of the commonwealth of Massachusetts, as his lawful successor."

The Chief Justice further says: " From the preceding observations, it is very clear, that the common law, which was in force, had superseded the necessity of defining by statute, alienage or allegiance. And from the definitions of alienage and allegiance, the nature and effect of naturalization and of

expatriation are manifest. We now have legal principles, to direct us in pleading alienage. The plea of alien friend, must allege that the supposed alien was born without the allegiance of the commonwealth." "This claim of the commonwealth to the allegiance of all persons born within its territories, may subject some persons who, adhering to their former sovereign, and residing within his dominions, are recognized by him as his subjects, to great inconvenience, especially in time of war, when two opposing sovereigns may claim their allegiance. But the inconvenience cannot alter the law of the land. If they return to the country of their birth, they will be protected as subjects."

Many of the observations of the learned Chief Justice, were of course intended only for the case then before him, which was one of the *Ante-Nati,* born there before the Revolution; but the clear position is maintained, that the common law still furnishes the rules of alienage and allegiance, and that one born within the state, is a citizen of the state, without reference to any other circumstance. And see on this point of setting up alienage by plea, *Cox* v. *Gulick,* (5 Halsted's N. J. Rep. 328,) where it is held that the plea must aver as at common law, that the person was an alien, and that he was born out of the allegiance of the state, and within the allegiance of a foreign state. The same form is pursued in this state. (*Clarke* v. *Morey,* 10 Johns. 69 ; *Bell* v. *Chapman,* ibid. 183.)

In 2 Pickering's R. 394 note, is an opinion of the Supreme Court of Massachusetts, drawn up by Chief Justice Parker, upon a question submitted to them by the Senate of that state, relative to the citizenship of George Phipps, in which they claim that upon the Revolution the state succeeded to the sovereign power, and all who were born within her limits, owed allegiance to her as their sovereign.

In *Barzizas* v. *Hopkins,* (2 Rand. R. 278. 281,) in the Court of Appeals of Virginia; Green, Justice, says, "the place of birth, it is true, in general determines the allegiance."

In *The State* v. *Manuel,* (4 Dev. & Battle's Law Rep. 25,) Judge Gaston, in delivering the judgment of the Supreme Court of North Carolina, declares that according to the laws of

that state, all human beings within it who are not slaves, fall within one of two classes, to wit, aliens and citizens; and all free persons born within the state, are born citizens of the state.

In the face of all these legislative expressions, and these opinions of great and learned judges and authors in various parts of the Union, and in all periods of our national career; some of whom were contemporary with the revolution, and many of them contemporary with the sages who established our national government, and at least one participated in that immortal work; it would be presumptuous in me, even if my own views had inclined the other way, to hold that the birth of Julia Lynch within our dominions did not confer upon her the rights of a citizen of the United States.

7. Before parting with the subject, I will examine further the grounds on which the citizenship of Julia Lynch was denied.

It was assumed to be an indisputable proposition, that by the international or public law, she was an alien; for that by the public law, the child follows the political condition of the parent. It is evident that this rule, without very important qualifications, might lead to the perpetuation of a race of aliens; for if no one of the successive fathers effected his naturalization during the minority of the next in succession, generation after generation would continue in a state of alienage. Accordingly, the difficulty is sought to be obviated, by giving to the child born of alien parents, the election, on arriving at maturity, to become a citizen, either of the state where he was born, or of the state of which his father was a member. In effect, this brings us back to the theory of the formation of states and governments, by voluntary compact of their inhabitants; and yields to every man, the unqualified right of throwing off allegiance by birth, whenever he becomes of age, and attaching himself to any community which pleases him. And if he may do it when he attains his full age, why may he not exercise the same natural right, every successive year of his life? And with these notions of allegiance fully established, a state with a well appointed army of its citizens in the field to-day, might to-morrow find itself without citizens, and its troops in the full fruition of a new allegiance, in the ranks of its enemy.

Waiving these considerations, what, in a case like that of Julia Lynch, is to be her political quality and condition, until the period of her right to elect shall have arrived? In her case, (and it will often happen in similar cases,) important events occurred in the mean time, and rights accrued, which must be determined by the state of things then existing. Is it not unwise in the state, and unjust to the infant, to withhold the quality of the citizen, or keep it in abeyance, until the years of discretion are attained? Even with the right of election established, there must be some fixed rule determining the allegiance, until the period for making the election arrives. Shall that rule be founded upon the place of birth, or the place of the parents birth; upon their allegiance at the time of the birth of the *propositus*, or upon their domicil at that time, or during the subsequent period?

The difficulty of answering these inquiries satisfactorily, strikingly exhibits the impracticability of the principle sought to be applied to this case.

I do not find that the rule derived from the public law is so clearly in favor of the complainant, as was contended by him. Mr. Justice Story, who is familiar with the Continental writers upon public law, says "that certain principles (relative to national domicil) have been generally recognized by tribunals administering public law or the law of nations, as of unquestionable authority. First. Persons who are born in a country, are generally deemed to be citizens and subjects of that country. A reasonable qualification of the rule would seem to be, that it should not apply to the children of parents who were *in itinere* in the country, or who were abiding there for temporary purposes, as for health, or curiosity, or occasional business. It would be difficult, however, to assert, that in the present state of public law, such a qualification is universally established." (*Story's Conflict of Laws*, 47, § 48.)

Thus, the learned commentator sets out with the common law principle; and while he suggests certain modifications of the general rule, which might be deemed reasonable, but which are unknown to the common law; he does not consider them as fully established, even in the public law.

The rule contended for is one confined to countries which derived their jurisprudence from the civil law, and is more properly a rule of the civil law, than one of the public law, or law of nations. Thus in the Digest, "Filius civitatem, ex qua pater ejus naturalem originem ducit; non domicilium sequitur. (*Digest: Lib.* 50, *Tit.* 1., *Ad Municipalem; et de incolis, l.* 6, § 1, *and ibid. l.* 17, § 11.) And it recognized the right of the son, notwithstanding, to establish his own domicil. (*See note* 25 *to* § 11, *last cited, and ibid. l.* 27.)

So in France, following the rule of the civil law, they hold that every child born of a Frenchman in a foreign country, is French. Their code also provides for expatriation, and for an election to become a Frenchman, in behalf of those born in France of a foreigner. (*Code Napoleon,* B. 1. tit. 1, ch. 1, § 10; also § 9, and chap. 2.) And such was the law of France three centuries ago. (*Jenk. Cent. Ca.* 5 *Cent. Case,* 91.)

In Spain, however, where the Visigoths nominally excluded the civil law, and really adopted its principles almost in mass, the law concedes the rights of a natural born subject, to all persons born in the kingdom, and to children born elsewhere, whose father was a native of Spain. (*De Partidas,* 4, tit. 24, Law 2; *Novisima Recopilacion de las Leyes de Espana,* lib. 1, tit. 14, 1. 7; *Institutes of the Civil Laws of Spain,* B. 1, tit. 5, c. 1, § 1.)(a)

The writers on public law, are by no means agreed upon the question before me; although they were strongly imbued, by their studies and habits, with the spirit of the civil law.

---

(a) Institutes of the Civil Laws of Spain, by Doctors D. Ignatius Jordan de Asso Y Del Rio, and D. Miguel de Manuel Y Rodriques, Book 1, tit. 5, cap. 1, and § 1.

Since writing this opinion, I have been informed by a friend who examined the subject recently while in Europe, (the Hon. John A. Dix, now of the Senate of the United States,) that these provisions relative to citizenship, are embraced in the new Constitution of Spain. The Constitution provides further, that foreigners who establish their permanent residence in Spain, shall be entitled to the rights of natural born subjects.

He also informs me, that by the last Constitution adopted in Portugal, (that of 1837,) children born in that kingdom of alien parents are native born subjects, and the same rights are conferred on children born abroad, whose father was a native of Portugal.

Vattel says, the natives, or *indigenes*, are those born in the country of parents who are citizens. That in order to be of the country, it is necessary that a person be born of a father who is a citizen, for if he is born there of a stranger, it will be only the place of his birth, and not his country. (*Vattel's Law of Nations*, B. 1, ch. 19, § 212.) He further says, in reference to the inquiry whether children born of citizens in a foreign country, are citizens, that the laws have decided the question in several countries, and it is necessary to follow their regulations. That in England being born in the country, naturalizes the children of a foreigner. That by the law of nature alone, children follow the condition of their fathers, and enter into all their rights. But he puts forth that opinion on the supposition, that the father has not entirely quitted his country in order to settle elsewhere. If he has fixed his abode in a foreign country, he is become a member of another society, at least as a perpetual inhabitant, and his children are so too. (*Ibid.* § 214, 215. *And see* § 219.) Thus the rule of Vattel, is controlled by the *intention* with which the father takes up his abode in the foreign country.

Pufendorf, who is also cited in support of the civil law rule, says that all those who are born of a citizen, are deemed by that circumstance alone, to submit themselves to the sovereign power on which their parents depend. He, however, does not speak of children born of citizens in foreign countries; and from the context, as well as the residue of the section referred to, it is probable that his observations were intended to be limited to the children born in the state, who were the descendants of those who in theory first formed the civil government. (2 *Pufendorf by Barbeyrac*, 303, liv. 7, chap. 2, § 20.)

Schmier, another writer on public law, is more explicit. He says : " Continuatur subjectio, nativitate ; natus enim ex subdito vel cive, fit subditus ac civis illius civitatis, cujus pater est membrum et pars." And he cites to the same effect, Hertius, De Modo Constit. et Civit. vol. 1, § 1, subd. 7. (*Schmier Jurisprud. Publica*, lib. v. cap. 1, § 3, 42; and see *Boehmer, Introductio in Jus. Digestorum, Germaniæ*, lib. 3, cap. 1, § 15 ; 2 *Rutherforth's Institutes of Natural Law*, 41, B. 2, ch. 2, § 6.)

Lynch v. Clarke.

On the other hand, Domat says: " Strangers who are like-wise called aliens, are those who, being born in another coun-try, and subjects of another kingdom than that of which they are inhabitants, have not been naturalized." And again : " The children of strangers born in a kingdom in which their father was an alien, having their origin in that kingdom, are subjects thereof ; and they have in it the rights of naturalization, as if their father had been naturalized a subject of it, and they suc-ceed to him, although he dies an alien." (2 *Domat's Civil Law, by Dr. Strahan,* 376 ; *Title, Public Law,* B. 1, tit. 6, § 4, subd. 2 and 5.)

Burlamaqui, who places the rights of subjection and protec-tion in the case of children, upon mutual consent, says, that on their attaining to the years of discretion, their remaining in their native country is deemed a submission to its government, and they are then members of the state. (2 *Burl.* 31, *Princi-ples of Politic Law,* part 1, ch. 5, § 10, 11, 13.) He does not state the rule as to those born of foreign parents, and it is evi-dent that he would leave them to the same election which he gives to those born of citizens.

In 6 *Hall's Amer. Law Journal,* 30, 37, is to be found ; " Discussions on the question whether inhabitants of the United States, born there before the Independence, are, on coming to this kingdom, (England,) to be considered as natural born sub-jects. By a barrister. December 9, 1810." The writer was John Reeves, Esq., the author of the History of the English Law. His conclusion on that question was not in accordance with the subsequent decisions, either there or here. I cite the work because of his argument on the objection to the inconsis-tency of Americans being citizens of the United States while here, and being British born subjects when there. He says : " This is not a novelty, nor is it peculiar to Americans. It may happen to any British subject, and it is allowable in our law, which recognizes this double character of a person, being as was before shown, ad fidem utriusque regis." And he asks, " Do not British subjects become citizens of the United States ? Some persons are born to such double character ; children and grandchildren, born of British parents in foreign countries, are

British born subjects; yet these, no doubt, by the laws of the respective foreign countries, are also deemed natural born subjects there."

These references show that the rule which the complainant derives from the writers on public law, is not even in theory, clearly defined or uniformly held. That the most approved authorities, do not deviate from the rule of the common law, any further than Judge Story has suggested that it is reasonable to deviate; and to establish such a departure, would involve the whole subject, as it respects the children of foreigners, in the obscurity ever attendant upon evidence of intention, the *animus manendi* upon a change of residence; an obscurity the greater in these cases, because the question generally arises after the lapse of many years. The advantages to result from a resort to such an uncertain and fluctuating rule, are more ideal than substantial; and are completely overborne by its inconveniences, when contrasted with the simple and plain rule of the common law. The qualifications mentioned by Judge Story, and which are not universally established in the public law, are certainly unknown to the common law in England, and as established in the United States. There is no authority, and unless Mr. Dane's Abridgment be an exception, not a single work on American law, that asserts the existence of either of those qualifications.

In 4 *Dane's Abridgment*, 701, ch. 131; art. 2, § 8, he says : " And now, if an American citizen goes abroad and marries an alien wife, and have a child by her in a foreign country, that child is not alien, but may inherit his estate in the United States. But if an American woman, a citizen, go abroad and marry an alien husband, and have a child by him so born, that child is an alien, and cannot inherit her estate in the United States. And upon the same principle, if an English subject comes into the United States, and marries an American wife, and has a child by her *born here*, it cannot inherit her estate here, *because this child follows the allegiance of its father, and may inherit his estate in England.*" Manifestly a *non sequitur*, because in the case first put, the child, if born in England of an American father, unquestionably owes alle-

giance in England, is a subject of that country, and may inherit there. Yet he is, as the author says, a citizen of the United States also. And by the same rule, the child born here of the English father, is a citizen here, and may inherit here, as well as in England. In short, both are cases of that double allegiance, which is effected by the rule of the common law, and which Mr. Reeves says is not a novelty, nor peculiar to that law.

With these remarks, I dismiss the argument founded on the rule of the public law, its fitness and adaptation to the spirit of our institutions.

The provisions of the naturalization laws enacted by Congress, are urged as decisive, that children born here of alien parents were not citizens. The act of 1802, § 4, declares that the children of persons duly naturalized under any of the laws of the United States, or who, previous to the passing of any law on that subject by the government of the United States, may have become citizens of any one of the states, under the laws thereof, being under the age of twenty-one years at the time of their parents being so naturalized or admitted to the rights of citizenship, shall, if dwelling in the United States, be considered as citizens of the United States. (2 *Story's Laws of U. S.* 852, 3.) A similar provision was enacted in the acts of 1790 and 1795. And the second section of the Act of 1804, provided that when any alien who had declared his intention, &c., should die before he was actually naturalized, his widow and children should be considered as citizens, and entitled to all the rights and privileges as such, upon taking the oaths prescribed by law. (2 *ib.* 943.) This section was repealed in 1828, (ch. 106.)—The acts make no distinction between children born here, and those born abroad, and it is said, this shows that none existed. That if, in fact, there had been any difference, the statutes would have provided only for the latter class.

The general words used, do not prove that general words were necessary. The statutes were necessary, and every part of them is fulfilled, although children born here were already citizens. They operate on the much larger class of the children

of aliens, viz : those who were born abroad. With a law which admits aliens to naturalization after five years residence, the children that are born to them in the five years, will usually bear but a small proportion, to the number who come with their parents from abroad. It was just as necessary in the act of 1804, to have ditinguished between widows who were already citizens, and those who came here with their alien husbands. For a great many adult aliens come here single men, and marry citizens. Probably as great a proportion of the widows who are provided for in the general words of the Act of 1804, are native citizens, as the proportion of the whole number of children embraced by both acts, who are born here ; yet no distinction respecting widows who are citizens, is made in the Act of 1804. And on this omission, the same argument urged relative to the children, will prove that all the widows of aliens must of necessity be aliens.

Upon the whole, the implication claimed from these statutes is not a necessary one, and cannot be raised to overturn an established legal principle.

The difficulty in reference to citizens of Louisiana, where the civil law prevails, is readily answered. When the territory of Louisiana was ceded to this country, our national law was extended over it, in all matters affecting its connection with the nation at large ; and when the state of Louisiana was erected and brought into the Union, as one of the consequences of that act, she relinquished to the rule of the national law which was then in force, the future regulation and control of the subject of citizenship within her territory, at least in its primary and national sense. And although before that event, the law in the Louisiana territory may have been such, that children born there of alien parents were aliens, (as to which I express no opinion ;) yet after she became a state, children born there of alien parents would undoubtedly be citizens of the United States. And thus no clashing or incongruity could ensue, in the case of Louisiana, from the existence of the national common law rule, and the provisions of the Constitution conferring upon citizens of each state the privileges of citizens in all the states.

The case of *Inglis* v. *The Sailors' Snug Harbor*, (3 Peters,

Lynch *v.* Clarke.

99, &c.,) was cited as having been decided on the principle of public law, that the national character of an infant followed the condition of his father. I do not so understand the decision. The infant in that case, was born in the city of New-York, before the 4th July, 1776. He remained there with his father, (who was a royalist,) while the British held possession of the city. When they evacuated it, the father left the country, taking the infant with him. The latter never returned to the United States ; and in process of time, became a bishop in the established church, in England, and was domiciled in Nova Scotia. The decision of the Supreme Court of the United States was, that he was born a British subject, and that he continued to be an alien in regard to this country. This, and the case next cited, together with several in the courts of the States, and some in England, hereafter mentioned, were decided upon the novel and peculiar circumstances growing out of the American revolution, and the dismemberment of the British empire thereby.

The doctrine settled by these authorities is, that on the separation of the Colonies, the United States and Great Britain became respectively entitled, as against each other, to the allegiance of all persons who were at that time adhering to the governments respectively ; and that those persons became aliens in respect to the government to which they did not adhere.

In our decisions, the time fixed for the application of the rule, is the Declaration of Independence. In the British authorities, it is applied at the date of the treaty of peace in 1783.(*a*)

On this principle, it is manifest that Bishop Inglis, who at his birth was a British subject, who never adhered to this country, and never, after he became old enough to exercise a discretion, manifested any intention to return here, was an alien in

---

(*a*) 2 *Kent's Com.*, 2d ed., 60 ; *Inglis' case*, (3 Peters, 121, per Thompson, J. ;) *Shanks* v. *Dupont*, (3 Peters, 242 ;) *M'Ilvaine* v. *Coxe's Lessee*, (4 Cranch, 209 ;) *Kilham* v. *Ward*, (2 Mass. 236 ;) *Gardner* v. *Ward*, (ibid. 244 ;) *Phipps' case*, (2 Pick. 394, note ;) *Chapman's case*, (1 Dallas, 53 ;) *Hebron* v. *Colchester*, (5 Day, 169 ;) *Jackson ex dem. Russell* v. *White*, (20 Johns. 313 ;) *Doe dem. Thomas* v. *Ackland*, (2 Barn. & Cress. 779 ;) *Doe* v. *Mulcaster*, (5 ibid. 771 ;) *The Providence*, (Stewart's Vice Adm. Rep. 186.)

1783, and continued to be an alien thereafter. He never owed allegiance to this state, or to the confederation. He was not a person *abiding* within this state on the 16th July, 1776, within the meaning of the ordinance of the convention of this state. (*Jackson* v. *White*, 20 Johns. 313, 326.) If Bishop Inglis had been born after July 4, 1776, and before the 15th of September, when the British army took possession of the city of New-York, (which was one aspect in which that case was considered,) he would have either owed an allegiance to this state, or, being an infant, and the country in a state of revolution, his *status* would have been indeterminate until the treaty of peace, and then controlled by the principle of his adherence to the one country or the other. Assuming that he owed allegiance to New-York, then the events of the revolution having rendered the application of a new principle necessary to his and the like cases in both countries, it would be reasonable for the courts to hold that on his attaining a suitable age to decide, he might determine for himself as to his future citizenship, and in the mean time, that his father's election should be considered as his own: Such a decision would not be an adoption of the entire doctrine of the civil law as to alienage, nor an abandonment of any of the well settled rules of the common law. It would be merely the resort to first principles in a new case. No case has gone to this extent, if, as I understand the report of the facts in Inglis v. The Snug Harbor, the plaintiff was born before the Declaration of Independence. In *Trimbles* v. *Harrison*, (1 B. Monroe's Law and Eq. Rep. 140, 146, Kentucky,) the decision was like that in Bishop Inglis' case, on the alienage of one born here before the Revolution.

In *Shanks* v. *Dupont*, (3 Peters, 242,) a lady born in South Carolina, (whose father adhered to the United States and died in 1782,) married a British officer in Charleston, in 1781, that city being then in possession of the enemy. In 1782 she went with her husband to England, and lived there till her death, in 1801. It was held that at the Treaty of Peace in 1783, she was a British subject, within the meaning of the provision of the treaty. That her removal was a voluntary dissolution of her allegiance, and it became fixed to the British Crown by the

Treaty of Peace. Judge Story, in his opinion, rested upon the grounds that she was not incapacitated by coverture from determining her allegiance on the Revolution in the government, and her removal and the Treaty, effected a dissolution of the allegiance to the state of South Carolina. Mr. Justice Johnson dissented, on the ground that the common law disallowed of expatriation, and it was in that respect the law of South Carolina.

These cases growing out of the anomalous state of allegiance produced by the Revolution, cannot with propriety, be deemed authorities against well established principles, as applicable to the ordinary questions of alienage and allegiance. In the one, the new principle applied to an unprecedented case, happens to be analagous to principles which the civil law applied to all the children of foreigners. It does not, therefore, follow that the Supreme Court of the United States thought the civil law to be right, and the common law wrong, in respect to the citizenship of such children. In the other case, the common law rule as to expatriation was departed from, because the separation of the countries by a revolution, and the construction of the treaty, were supposed to require it. It does not follow that the rule of the common law was therefore abandoned in all cases of expatriation, much less in its application to citizenship by the place of nativity.

In conclusion, I entertain no doubt but that Julia Lynch was a citizen of the United States when Thomas Lynch died. She therefore inherited the property in controversy, if Thomas Lynch had any estate therein, to the entire exclusion of the complainant, who was then an alien, and incapable of taking by descent.

It is unnecessary, in this view of the case, to examine the right of Thomas Lynch to the premises in question. The complainant's bill must be dismissed. The question which I have discussed and decided, was new in our courts. For this reason, and others that arise upon the merits of the case, I will give no costs to the defendants.